FILED

13 JUN 19 PM 3: 50

CLERK U S DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY: _____

Richard M. Wirtz (SBN 137812)
rwirtz@wirtzlaw.com
Erin K. Barns (SBN 286865)
ebarns@wirtzlaw.com
W I R T Z   L A W   APC
4365 Executive Drive, Suite 1460
San Diego, California 92121
voice: 858.259.5009

Thomas D. Foster (SBN 213414)
TD Foster - Intellectual Property Law
11622 El Camino Real, Suite 100
San Diego, CA 92130
voice: 858.922.2170
foster@tdfoster.com

Attorneys for Plaintiffs
CELEBRITY CHEFS TOURS, LLC and
PROMARK PRODUCTIONS, LLC

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

CELEBRITY CHEFS TOUR, LLC, a
California limited liability company; and
PROMARK PRODUCTIONS, LLC, a
California limited liability company,

     Plaintiffs,

v.

MACY'S, INC., a Delaware corporation;
WHIRLPOOL CORPORATION, a
Delaware corporation;
LEC Media, LLC., an Illinois limited
liability company;
EXECUTIVE PROGRAM SERVICES,
INC., a Washington corporation;
JACK O'DONNELL, an individual;
SCOTT DUMMLER, an individual;
DEVIN ALEXANDER, INC., a
California corporation;
DEVIN ALEXANDER, a.k.a. RENEE
SIMONE, an individual; and
DOES 1 through 10, inclusive,

     Defendants.

Case Number:

CV13-   4438 JAK (VBKx)

**COMPLAINT FOR:**

1. **Breach of Contract (Macy's)**
2. **Breach of Contract (LEC, O'Donnell, Dummler)**
3. **Breach of Contract (Alexander)**
4. **Intentional Misrepresentation**
5. **Negligent Misrepresentation**
6. **Conversion**
7. **Trademark Infringement**
8. **False Designation of Origin**
9. **Trademark Dilution**
10. **Common Law Unfair Competition**
11. **California Bus. & Prof. Code §17200 Unfair Competition**
12. **Misappropriation of Ideas**
13. **Intentional Interference with Contractual Relations**
14. **Intentional Interference with Prospective Economic Advantage**
15. **Negligent Interference with Contractual Relations**
16. **Negligent Interference with Prospective Economic Advantage**
17. **Declaratory Relief**

WIRTZ LAW APC
4365 Executive Drive, Suite 1460
San Diego, CA 92121
voice 858.259.5009

COMPLAINT

Plaintiffs complain of Defendants, and each of them, and allege as follows:

## Parties

1.     Plaintiff, CELEBRITY CHEFS TOUR, LLC (hereafter sometimes referred to as "CCT") at all times relevant herein was and now is a limited liability company duly organized and existing under the laws of the state of California.

2.     Plaintiff, PROMARK PRODUCTIONS, LLC (hereinafter sometimes referred to as "PROMARK") at all relevant times was and now is a limited liability company duly organized and existing under the law of the state of California. PROMARK is a limited liability member of CCT. CCT and PROMARK shall be referred to herein collectively as "PRODUCER."

3.     PRODUCER is informed and believes and based upon such information and belief alleges, that Defendant MACY'S, INC. (hereafter "MACY'S") is and at all times relevant herein was a Delaware corporation, existing and transacting business within California.

4.     PRODUCER is informed and believes and based upon such information and belief alleges, that Defendant WHIRLPOOL CORPORATION is and at all times relevant was a Delaware corporation, existing and transacting business within California.

5.     PRODUCER is informed and believes, and based upon such information and belief alleges, that at all times relevant herein, Defendant LEC Media, LLC. (hereafter "LEC") was and now is an Illinois limited liability company transacting business in California.

6.     PRODUCER is informed and believes, and based upon such information and belief alleges, that at all times relevant herein, Defendant Executive Program Services, Inc. ("EPS") was and now is a Washington corporation, existing and transacting business within California.

7.     PRODUCER is informed and believes, and based upon such information and belief alleges, that at all times relevant herein, Defendant JACK O'DONNELL

WIRTZ LAW APC
4365 Executive Drive, Suite 1460
San Diego, CA 92121
voice 858.259.5009

(hereafter "O'DONNELL") was and now is an individual residing in Illinois and regularly and continuously transacting business in California. PRODUCER is further informed and believes, and based upon such information and belief alleges, that at all times relevant herein, O'DONNELL was an officer, managing agent, owner, proprietor, or otherwise executive in charge of production for LEC.   PRODUCER further alleges on information and belief that O'DONNELL gained dominion and control of LEC and through the exercise of such dominion and control caused the separate identity of O'DONNELL and LEC to cease, in that the acts, business and contracts of LEC were the acts of O'DONNELL,  and vice versa, and that LEC was and now is a business conduit through which O'DONNELL engaged in his business. There is such a unity of interest and ownership between O'DONNELL and LEC that the individuality and separateness of the Defendants has ceased.  Adherence to the fiction of LEC's and O'DONNELL's separate existence would, under the circumstances, promote and sanction a fraud and injustice.

8.       PRODUCER is informed and believes, and based upon such information and belief alleges, that at all times relevant herein, Defendant SCOTT DUMMLER (hereafter "DUMMLER") was and now is an individual residing in Illinois and regularly and continuously transacting business in California. PRODUCER is further informed and believes, and based upon such information and belief alleges, that at all times relevant herein, DUMMLER was an officer, managing agent, owner, proprietor, or otherwise executive in charge of production for LEC.   PRODUCER further alleges on information and belief that DUMMLER gained dominion and control of LEC and through the exercise of such dominion and control caused the separate identity of DUMMLER and LEC to cease, in that the acts, business and contracts of LEC were the acts of DUMMLER,  and vice versa, and that LEC was and now is a business conduit through which DUMMLER engaged in his business. There is such a unity of interest and ownership between DUMMLER and LEC that the individuality and separateness of the Defendants has ceased.  Adherence to the fiction of LEC's and DUMMLER's

WIRTZ LAW APC
4365 Executive Drive, Suite 1460
San Diego, CA 92121
voice 858.259.5009

separate existence would, under the circumstances, promote and sanction a fraud and injustice.

9.      PRODUCER is informed and believes and based upon such information and belief alleges, that Defendant DEVIN ALEXANDER, INC. is and at all times relevant was a California corporation, existing and transacting business within California.

10.     PRODUCER is informed and believes, and based upon such information and belief alleges, that at all times relevant herein, Defendant DEVIN ALEXANDER, aka RENEE SIMONE (hereafter "ALEXANDER"), was and now is residing in Los Angeles, California and transacts business in the above-entitled County, State of California.

11.     PRODUCER is presently unaware of the true names or capacities of Defendants DOES 1 through 100, inclusive, or any of them, and thus sues them herein by their fictitious names.  When and if the true names or capacities of any or all of these DOE Defendants have been ascertained, PRODUCER will seek leave of Court to amend this Complaint to insert the said true names and/or capacities in the place and stead of the present fictitious ones.

12.     PRODUCER alleges on information and belief that at all times relevant herein, each of the Defendants was the agent or employee of each of the other Defendants, and was, in doing the things herein complained of, acting within the course and scope of such agency or employment.

## **Factual Allegations**

13.     PRODUCER is the producer of a live tour (the "Tour") and television series based on and largely filmed on the Tour (the "TV Show"), known as "The Great American Chef's Tour" (hereafter "GACT").

14.     PRODUCER created the concept of GACT in 2008 and owns all copyrights for GACT, including the copyrights for (i) the show treatment, i.e., the description of the show, (i) the sponsor sales material, e.g., the powerpoint presentation

W I R T Z  L A W APC
4365 Executive Drive, Suite 1460
San Diego, CA 92121
voice 858.259.5009

to Macy's, (iii) the show scripts, e.g., what the host says on the show, and (iv) all of the show footage.

15.     The treatment for the TV Show was registered with the Writers Guild of America in 2010 (WGA No. 1423182).

16.     PRODUCER also owns the trademark and service mark for GACT (U.S. Trademark No. 4,145,234, First used in commerce on 11/1/2010, filed 4/4/2011, and registered 5/22/2012). PRODUCER also owns the URL www.GreatAmericanChefsTour.com and, in 2010, built and has continually operated the web site promoting GACT that resides at that address.

17.     In 2010, PRODUCER commenced working with Window To The World Communications, Inc. ("WTTW") of Chicago, a leading public television station and producer and distributor of content to public television stations nationwide, for the purpose of WTTW serving as the presenting station for the distribution of the TV Show.

18.     In February 2011, PRODUCER and WTTW entered into a contract for WTTW to serve as the presenting station for the TV Show, with WTTW to present the TV Show to public television stations nationwide in May 2011 and at the annual meeting of public television stations held that month. That contract anticipated that the TV Show would commence airing in the first quarter of 2012.

19.     Pursuant to its contract with WTTW, in April 2011, PRODUCER shot, edited, and delivered to WTTW a pilot episode of the TV Show ("Pilot No. 1").

20.     During May and June, 2011, WTTW presented the TV Show (including Pilot No. 1 and various written materials) to public television stations nationwide for their approval and solicited their consent to air the TV Show on those stations when it was ready for delivery.

21.     In June 2011, WTTW reported to PRODUCER that all but one of the public television stations nationwide that had been presented the TV Show had said that they would air the TV Show. The only negative comments reported from WTTW

WIRTZ LAW APC
4365 Executive Drive, Suite 1460
San Diego, CA 92121
voice 858.259.5009

were that there was some feedback that the lighting and sound quality of Pilot No. 1 was not up to public television station standards and there was some negative feedback about the TV Show host used in Pilot No. 1.

22.    In August 2011, PRODUCER and WTTW entered into a new contract for WTTW to present and distribute the TV Show. That contract called for the production and distribution of 26 episodes of the TV Show, with 13 episodes to be aired in Spring 2012 and 13 to air in Fall 2012.  In addition, that contract called for PRODUCER to be a sponsor of the Fall Marketplace of American Public Television ("APT"), a gathering of public television stations from across the country, scheduled to take place in Memphis in November 2011.

23.    In November 2011, PRODUCER was a sponsor of the APT Fall Marketplace and had a substantial presence at that event, during which PRODUCER and WTTW met with representatives of virtually every major public television station and every major US television market to present the TV Show. In addition, PRODUCER and WTTW solicited the involvement of those stations in the Tour and their participation in visits by the Tour to their respective cities.

24.    Based on the positive feedback from APT and the public television stations, PRODUCER decided to proceed with the production of the Tour and TV Show, to commence airing in Spring 2012.

25.    Prior to the APT Fall Marketplace, PRODUCER had begun soliciting potential sponsors for the Tour and the TV Show. Among the companies that it approached was MACY'S.

26.    On October 5, 2011, PRODUCER traveled to New York City and made an in-person presentation to Stacy Rosenthal ("Rosenthal"), Director of Special Events of MACY'S (which presentation included the delivery of a print-out of the PowerPoint presentation made during that meeting) of an opportunity for it to be a sponsor of the Tour and/or the TV Show.  That presentation went very well and a follow-up presentation, to include her boss, Amy Kuhl ("Kuhl"), was scheduled for October 14,

WIRTZ LAW APC
4365 Executive Drive, Suite 1460
San Diego, CA 92121
voice 858.259.5009

1   2011.

2       27.    On October 14, 2011, PRODUCER returned to MACY'S and made

3 another presentation of the Tour and TV Show to various MACY'S representative,

4 including Kuhl and Rosenthal. A revised PowerPoint (and print-outs thereof) was

5 presented to MACY'S, incorporating answers to questions posed and additional

6 information requested during the prior meeting. That proposal called for the Tour to

7 run from January through April 2012 and for the TV Show to air, commencing April

8 2012. Kuhl was extremely enthusiastic about GACT and proclaimed that "Macy's has

9 been looking for something like this to come along for a long time. This is exactly what

10 we have been looking for." She then said that she needed the approval of her boss,

11 Martine Reardon ("Reardon"), prior to approving MACY'S sponsorship of GACT as

12 Reardon "controlled all of the money." However, Kuhl expressed that she was

13 confident that a sponsorship package of $500,000 could "easily be approved."

14       28.    On November 7, 2011, PRODUCER returned to MACY'S for a meeting

15 with Kuhl, Rosenthal, and Reardon. During that meeting, PRODUCER presented a

16 further revised PowerPoint (and print-outs thereof), incorporating answers to questions

17 posed and additional information requested during the prior meetings. That proposal

18 still called for the Tour to run from January through April 2012 and for the TV Show

19 to air, commencing April 2012. During that meeting, Reardon expressed concern about

20 the Tour commencing in only two months (due to both budgetary and logistics

21 concerns) and asked PRODUCER if the Tour and TV Series could be pushed back to

22 accommodate MACY'S. PRODUCER responded that, with a commitment by MACY'S

23 to sponsor GACT, PRODUCER was confident that such an accommodation could be

24 made. During that meeting, Kuhl asked if the Tour could incorporate the MACY'S

25 name, as the title sponsor of the Tour. PRODUCER responded that it could, so long as

26 it is done in a way that does not interfere with PRODUCER's control and ownership

27 of the copyright, trademark, content, and the TV Show. PRODUCER also cautioned

28 about the MACY'S having an expectation of their name or logo being present in the TV

WIRTZ LAW APC
4365 Executive Drive, Suite 1460
San Diego, CA 92121
voice 858.259.5009

Show as such inclusions are prohibited by applicable Federal Communications Commission ("FCC") laws and regulations and the rules and regulations of APT (collectively referred to herein as the "Governing Laws"). Copies of both the Governing Laws were provided to MACY'S. MACY'S requested 1) to be able to approve the selection of the host of the Tour and TV Show, 2) to be able to have some of the Tour stops take place in their stores, in the cities where the Tour would be visiting, 3) to incorporate some of the chefs that MACY'S had a relationship with into the Tour and the TV Show, and 4) to have the ability to know what other sponsors would be involved in the Tour so as to prevent the direct involvement any of their direct competitors. PRODUCER agreed to those requests as well, subject to the Governing Rules.

29.     At the end of that meeting on November 7, 2011, after Reardon had departed, Kuhl advised PRODUCER that MACY'S sponsorship of the Tour and the TV Show had been approved.

30.     On November 9, 2011, Rosenthal and Kelly Lainsbury ("Lainsbury") called PRODUCER to advise that MACY'S had approved the sponsorship proposal for $500,000 and had reviewed and approved the list of cities that the Tour was planning to attend. They said that GACT was "everything they wanted" and shared that Reardon was very pleased that PRODUCER had agreed to delay the Tour and airing of the TV Show in order to accommodate MACY'S because she was concerned about "too much going on" in February and March.

31.     On November 24, 2011, PRODUCER was invited to attend, as a VIP guest, the Macy's Thanksgiving Parade. During that event, Kuhl, the grand marshal of the parade, introduced PRODUCER to numerous other VIP guests as the producer of "an exciting new tour and TV show" that MACY'S would be sponsoring and said that in 2012, PRODUCER would probably have a float in the parade to promote its TV Show.

32.     On December 6, 2011, Kuhl and Rosenthal called PRODUCER to advise

WIRTZ LAW APC
4365 Executive Drive, Suite 1460
San Diego, CA 92121
voice 858.259.5009

that they had received an email from Reardon about GACT in which she stated "I love it." Kuhl and Rosenthal again requested if PRODUCER could do separate events in a MACY'S store in each market where the Tour visits (separate from the event being taped for the TV Show). PRODUCER agreed, subject to MACY'S covering all costs and subject to Tour scheduling considerations, and again subject to the Governing Laws. They then informed PRODUCER that funding of MACY'S sponsorship had been approved to come out of Reardon's marketing budget but that the funds would have to come from the Spring and Fall 2012 budgets. Their final comments were "We are doing this!" and "This is the right fit for us!"

33. On December 9, 2011, Rosenthal called PRODUCER and asked if she could present potential involvement (as a part of MACY'S sponsorship) to Coke and WHIRLPOOL. PRODUCER consented.

34. On January 6, 2012, Rosenthal called and asked PRODUCER to send a revised Tour routing schedule (reflecting the dates for a Summer Tour and Fall commencement of airing of the TV Show) and a Purchase Order for MACY'S $500,000 sponsorship. Both items were sent that day. A true and correct copy of the Purchase Order is attached as **Exhibit 1** and incorporated by this reference.

35. On February 22, 2012, Kuhl and Rosenthal called PRODUCER to inform PRODUCER that the Purchase Order had been approved and that, in a meeting that day of "the entire group," Kuhl sold everyone on GACT and got "everyone on board." They asked PRODUCER to send an invoice, dated March 1, 2012, for the first payment of $100,000 due under the Purchase Order. They also asked PRODUCER to come to New York on March 5, 2012, to participate in a meeting with people from all of the various MACY'S departments that would be involved in the implementation of MACY'S sponsorship of GACT.

36. On March 2, 2012, PRODUCER had a telephone conference with Rosenthal, Lainsbury, and Rosenthal's assistant, Jodi Riddick ("Riddick"), to prepare for the March 5, 2012 meeting. During that call, they confirmed that they had received

WIRTZ LAW APC
4365 Executive Drive, Suite 1460
San Diego, CA 92121
voice 858.259.5009

the invoice for $100,000 sent by PRODUCER and that it was being processed for payment. They also reviewed who would be attending the March 5, 2012 meeting and what would be discussed.

37.     On March 5, 2012, PRODUCER participated in a meeting called by Kuhl in the MACY'S headquarters. In attendance were numerous other MACY'S employees who were introduced as heads of various different departments that would be involved in GACT. At the outset of the meeting, Kuhl announced that MACY's had agreed to be a sponsor of GACT and how everyone in her department was so excited about this new opportunity.  Then, at Kuhl's request, PRODUCER went through the PowerPoint presentation for GACT and distributed copies of various materials describing GACT and MACY'S sponsorship involvement to the participants. A true and correct copy of the Powerpoint presentation is attached as **Exhibit 2** and incorporated by this reference. That was followed by a Q&A session during which many of the participants asked about issues pertaining to their respective departments and all expressed excitement about this new sponsorship.  At the end of the meeting, Kuhl announced that MACY'S hoped to make this a multi-year arrangement with PRODUCER and thanked PRODUCER for coming to make that presentation.

38.     On March 14, 2012, Rosenthal called PRODUCER and advised that MACY'S had entered into an agreement with WHIRLPOOL whereby WHIRLPOOL would participate as a promotional partner of MACY'S (but not of PRODUCER) in the GACT. She also confirmed that the Purchase Order was being reviewed internally by Kuhl and Rachel Stern ("Stern") and that it would be signed and delivered to PRODUCER immediately.

39.     On March 19, 2012, Rosenthal and Riddick called PRODUCER for the purpose of asking if some of the TV Shows could be filmed in MACY'S stores. PRODUCER responded affirmatively, so long as those stores were well suited to filming the TV Show, but repeated that the TV Show must be in full compliance with the Governing Laws, specifically meaning that MACY'S would not be able to be

W I R T Z   L A W APC
4365 Executive Drive, Suite 1460
San Diego, CA 92121
voice 858.259.5009

visible or mentioned in the TV Show or have editorial control over the creation of the TV Show. They confirmed that MACY'S fully understood and agreed with those restrictions.

40.    On March 22, 2012, various people from MACY'S advertising agency contacted PRODUCER for the purpose of conducting a valuation analysis of the elements of GACT that MACY'S had agreed to sponsor. Over the course of the next two days, PRODUCER provided those individuals all of the information that they requested. At the end of their evaluation, Kuhl reported to PRODUCER that the agency had determined that MACY'S had actually under-paid for its GACT sponsorship and that the value of the Tour elements alone (not the TV shows), exceeded the $500,000 that MACY'S had agreed to pay to PRODUCER.

41.    On March 29, 2012, Riddick called PRODUCER and informed PRODUCER that the $100,000 check was ready for mailing but that MACY'S needed PRODUCER to submit an IRS form W-9. That form was signed and faxed to MACY'S that day. On April 5, 2012, Riddick requested that PRODUCER submit a MACY'S form certifying that PRODUCER is not minority owned.

42.    On April 16, 2012, PRODUCER staged and shot a live event for the second pilot for the TV Show (the "Pilot No. 2"), debuting ALEXANDER as the host of GACT and addressing the comments of WTTW and APT with regard to Pilot No. 1. MACY'S did not participate in that event nor did it have any presence in that episode of the TV Show, which was intended to air as one of the 26 episodes under the contract with WTTW.

43.    On April 16, 2012, PRODUCER signed and returned to MACY'S the Purchase Order (**Exhibit 1**) for MACY'S sponsorship. Rosenthal called PRODUCER and acknowledged receipt of that document and advised that she would have Kuhl sign it as soon as possible. Each of the many times thereafter that PRODUCER inquired about Macy's signature on the Purchase Order, MACY'S representatives responded that it was awaiting Kuhl's signature.

WIRTZ LAW APC
4365 Executive Drive, Suite 1460
San Diego, CA 92121
voice 858.259.5009

44.     On April 25, 2012, Riddick called PRODUCER to say that "the check is finally on its way. Thank you for your patience."

45.     On April 26, 2012, PRODUCER finally received MACY's $100,000 sponsorship payment (20% of the agreed total of $500,000) under their sponsorship agreement, which was coded by MACY's as "Sponsorship Ticket" on the payment stub.

46.     At all relevant times, PRODUCER planned and prepared for the Tour, including, but not limited to:

a.     Recruiting, selecting, and contracting with all of the chefs across the country that would be appearing in the Tour and the TV Show;

b.     Reviewing and selecting the recipes to be prepared by the chefs in the Tour and TV Show;

c.     Planning, coordinating, and paying for all of the elements of the Tour and the TV Show, including scheduling, travel, lodging, meals, sets and staging, equipment transportation, logistics, promotion, ticket sales, rehearsing, scripting, and staffing (both a national crew and local crews in each Tour city), for the Tour as a whole and for each stop thereon as well as every episode of the TV Show;

d.     Securing the venues for each of the Tour stops and tapings of the TV Show and conducting pre-Tour inspections and walk-thrus of each site;

e.     Securing the pre-production, production, and post-production crews (nationally and locally in each Tour city) for the taping of the Tour events and the creation of the TV Show, including interviewing and retaining LEC;

f.     Writing the Run-of-Show for each Tour show and the copyrighted script to be read by ALEXANDER at each Tour event and the taping for each episode of the TV Show;

g.     Preparing audience warm ups at each Tour show, including thanking the audience for attending PRODUCER's event and thanking MACY'S for

W I R T Z   L A W  APC
4365 Executive Drive, Suite 1460
San Diego, CA 92121
voice 858.259.5009

being a sponsor of that event and introducing ALEXANDER;

h.    Working with representatives of the local public television stations and other media outlets in each of the cities to be visited by the Tour;

i.    Working with numerous individuals and departments within MACY'S in order to accommodate their requests pertaining to the activation and implementation of their sponsorship;

j.    Worked with WHIRLPOOL to attempt to utilize their products in the planning and staging of the Tour and the TV Show, as had been promised to them by MACY'S (not PRODUCER);

k.    Writing all of the Press Releases and other descriptions of the Tour and the TV Show, to be used in all marketing and promotion; and

l.    Updating and supplementing the GACT web site with all information about upcoming shows, chefs, recipes, and other information and photos about GACT, the Tour, and the TV Show.

47.    In October 2011, PRODUCER had reached out to ALEXANDER to see if she was interested in auditioning for the role of the host of GACT. PRODUCER had previously retained ALEXANDER to appear in shows that it produced and presented at Disneyland.   ALEXANDER stated that she was very interested and referred PRODUCER to her new agent. Throughout the period from October 2011 through April 2012, PRODUCER and ALEXANDER's agent negotiated a contract for her hosting of GACT.  A true and correct copy of the written contract is attached as **Exhibit 3** and incorporated by this reference. During that period, PRODUCER arranged for ALEXANDER to meet with Rosenthal and KUHL to make sure that they were pleased with her selection and hiring by PRODUCER. PRODUCER also sent materials to WTTW and APT about ALEXANDER, including her reel, to make sure that they also found her to be acceptable as PRODUCER's host of GACT.  All of the above parties were pleased with PRODUCER's hiring of ALEXANDER as the host of GACT. On April 14, 2012, PRODUCER received the signed contract from

W I R T Z   L A W APC
4365 Executive Drive, Suite 1460
San Diego, CA 92121
voice 858.259.5009

WIRTZ LAW APC
4365 Executive Drive, Suite 1460
San Diego, CA 92121
voice 858.259.5009

ALEXANDER (the "Alexander Contract").

48.     On April 19, 2012, at the suggestion of WTTW, PRODUCER contacted DUMMLER and LEC for the purpose of discussing the possibility of hiring them to do the editing of Pilot No. 2 and to and do the filming of the Tour as well as the possible post-production work on the TV Show. In or about April 2012, following several discussions with DUMMLER, PRODUCER entered into an agreement evidenced by a series of emails (the "LEC Agreement") with LEC, under the terms of which LEC would serve as an independent contractor editor of Pilot No. 2 and the independent contractor production company, on behalf of PRODUCER, to, among other things to be determined from time-to-time, provide PRODUCER with all production, post-production, technical, and logistical services that PRODUCER deemed were necessary for the filming of the Tour and the possible post-production of that content, in a timely manner, so that the TV Show could be distributed to public television stations for presentation and airing commencing with the fall 2012 television season. The LEC Agreement was never reduced to a single formal written document. Its salient terms contained in the emails, however, included the mutual understanding that ownership of all intellectual property and creative assets pertaining to GACT, including, but not limited to the copyrights, trademarks, tapes and other recordings, records of the programs produced and post-produced, in whatever form, were and would, at all times, remain exclusively the property of PRODUCER and would be delivered to PRODUCER at any time, on demand.

49.     On May 4, 2012, Riddick and Lainsbury called PRODUCER and stated that Kuhl has insisted that chefs associated with MACY'S be included in each Tour stop and that the actual live Tour events be held in MACY'S stores, whenever possible. Finally, they announced that Kuhl had decided that she wanted to review the Tour routing and was going to let PRODUCER know if she approved of the cities that the Tour was scheduled to visit. PRODUCER made it clear to MACY'S that, as a sponsor of the TV Show, they cannot have any editorial control over the content (i.e., where the

TV Show visits, who is featured in it, or where it is taped) nor can their name or marks be included in the TV Show. Further, PRODUCER explained that PRODUCER would include chefs associated MACY'S could only be included in the Tour and TV Show if they had an actual presence in that city that the Tour was visiting since the Tour and TV Show are about presenting the best "local chefs" in each city. PRODUCER specifically referred them to applicable portions of the Governing Laws. Riddick and Lainsbury cautioned PRODUCER that Kuhl is "used to getting her way" and that PRODUCER should "never say no to her."

50.    On May 8, 2012, PRODUCER met with representatives of WTTW and DUMMLER in Chicago to review various elements pertaining to the scheduling and production, promotion, and airing of the TV Show.  During that meeting, WTTW reviewed with them the production requirements for the TV Show and the Governing Laws. When PRODUCER advised WTTW of some of the issues that it was having with MACY'S, WTTW made it clear to PRODUCER and DUMMLER that, as a sponsor of the TV Show, MACY'S cannot have any editorial control, cannot have logo or name inclusion in the TV Show, and must comply with all of the Governing Laws. DUMMLER acknowledged to WTTW and PRODUCER that LEC was an independant contractor of PRODUCER and would do as instructed by PRODUCER. DUMMLER also acknowledged that he was well aware of the Governing Laws and was aware that MACY'S, as a sponsor of the TV Show, cannot be allowed to do any of the activities cautioned by WTTW and must fully-comply with the Governing Laws.  PRODUCER stated to all present that since LEC and DUMMLER had such extensive workings with public television programming, WTTW, and APT, PRODUCER would rely on LEC and DUMMLER to ensure that GACT is, at all times, in full compliance with the Governing Laws. During that meeting, WTTW also insisted that PRODUCER allow it to announce the commencement of the Tour so that public television stations nationwide could get excited about the launch of GACT and the impending airing of the TV Show.

WIRTZ LAW APC
4365 Executive Drive, Suite 1460
San Diego, CA 92121
voice 858.259.5009

51.     The Tour was scheduled to commence on May 30, 2012, in Seattle, and was going to run through mid-July, where it was going to end in Chicago. Throughout the month of May, 2012, PRODUCER had numerous communications with MACY'S about the need to confirm Tour venues, cities, chefs and other arrangements. Unfortunately, MACY'S consistently demonstrated a lack of capabilities, disorganization, lack of authority, and a never-ending pattern of changing direction, all of which was dictated by Kuhl.  PRODUCER repeatedly complained that MACY'S conduct was driving up the cost of the Tour and the TV Show and that they were jeopardizing the success of GACT.  Nevertheless, PRODUCER attempted to accommodate MACY'S in every way possible. As a result, numerous and significant elements of the Tour had to be changed frequently and often at the last minute (e.g., as late as May 16, 2012, Riddick advised PRODUCER that Kuhl was insisting that the Tour drop several cities it was planning to visit).

52.     On May 13, 2012, PRODUCER sent MACY'S an invoice for $100,000, representing the second installment of its sponsorship contribution.

53.     On May 17, 2012, PRODUCER learned from Riddick that MACY'S had created a logo entitled "Macy's Great American Chefs Tour."   PRODUCER immediately warned Riddick that GACT is the name of the Tour and the TV Show and is a registered, protected, and trademarked name of PRODUCER.  Riddick advised PRODUCER that Kuhl had insisted that MACY'S create that new logo and use it in their own internal and in-store promotions of the Tour and the TV Show. PRODUCER stated that it would not allow that name to be used in any of its Tour publicity and that it would not be used in the Tour or on the TV Show.

54.     On May 18, 2012, PRODUCER had a conversation with Rosenthal to address the issues set forth above and to ask her to re-take a more active role in GACT planning and coordination. PRODUCER also inquired again about the status of the Purchase Order. Rosenthal advised PRODUCER that she is thinking of quitting MACY'S because of the unethical and "mean-spirited" manner that Kuhl conducts

WIRTZ LAW APC
4365 Executive Drive, Suite 1460
San Diego, CA 92121
voice 858.259.5009

business and treats others, including both MACY'S employees and third parties. Rosenthal stated that she (and others) found working with Kuhl so intolerable that she could not continue for much longer and that the situation had even resulted in a decline in her personal health. Rosenthal warned that Kuhl loved GACT so much that she was trying to take control of it (possibly even ownership of parts of it) and that she and Stern have been scheming how to revise the Purchase Order to make that possible. PRODUCER thanked her for that warning. Finally, Rosenthal apologized for the fact that she had not been more involved in the GACT planning and implementation but explained that Kuhl had become upset with the fact that she kept insisting that MACY'S keep to the deal that they had negotiated and agreed to, while Kuhl had insisted on continuing to take more and more, knowing that PRODUCER would be more and more over a barrel as the Tour commencement date approached. She explained that Kuhl had replaced her with people who would merely follow her orders, no matter what they are. When PRODUCER addressed the fact that the proposed "Macy's Great American Chefs Tour" logo could not be used in connection with the Tour or the TV Show, Rosenthal responded that she was aware of that fact and had cautioned Kuhl and Stern in that regard. Finally, Rosenthal assured PRODUCER that she would stay with MACY'S until the Tour was finished and that she would re-take control over as much of the bad situation as was possible.

55.     On May 20, 2012, PRODUCER sent MACY'S a lengthy email setting forth numerous issues and problems being caused by MACY'S.

56.     On May 21, 2012, PRODUCER learned that Rosenthal had quit her employment at MACY'S and that Riddick had been assigned to take over her position (even though Riddick was scheduled to take a 2 week vacation within days immediately before the start of the Tour).   Later that day, PRODUCER had a conversation with Rosenthal during which Rosenthal confirmed that she had quit MACY'S and stated that she had done so because she could no longer tolerate Kuhl's actions, behavior, and treatment. Rosenthal then cautioned PRODUCER that Kuhl was

attempting to "steal" GACT away from PRODUCER and that MACY'S and WHIRLPOOL were conspiring in order to do so. Rosenthal then confirmed that GACT and all rights to it are owned by PRODUCER and that MACY'S is well aware that their logos cannot be included in the TV Show and that there cannot be reference to them in the body of the TV Show, a fact that she said she had specifically explained to Kuhl, Stern, and Riddick before her departure from MACY'S. Finally, Rosenthal offered that she thought she could independently secure at least one additional sponsor for the Tour and TV Show. That conversation was confirmed in an exchange of emails between PRODUCER and Rosenthal.

57.    At the request of MACY'S, PRODUCER worked with WHIRLPOOL in order to make changes to the stage kitchen to include WHIRLPOOL appliances and to use, whenever possible, WHIRLPOOL appliances on the Tour. WHIRLPOOL was advised (and specifically acknowledged, on several occasions) that it cannot be a sponsor of the TV Show since its appliances would be visible within the TV Show and that, even then, any visual inclusion of their logos on the products used would have to be the least amount possible.

58.    On May 22, 2012, Kuhl called PRODUCER and accused PRODUCER of changing the deal between PRODUCER and MACY'S, stating that Rosenthal had informed her that MACY'S could use its own logo on the Tour and in the TV Show and that both the Tour and the TV Show would be called "The Macy's Great American Chefs Tour." When PRODUCER stated that was not the agreement between the parties and referred Kuhl to both the PowerPoint presentations made to MACY'S before they agreed to their sponsorship as well as the Purchase Order sent to MACY'S months earlier, Kuhl responded, "I don't care what those say. I know what I want and MACY'S is going to get it or we are not making any more payments." Kuhl then stated "MACY'S owns this show, like we own the parade and the fireworks. We can do what we want!" PRODUCER strongly objected to those statements and advised Kuhl that PRODUCER will be evaluating the cancellation of the Tour rather than continuing

WIRTZ LAW APC
4365 Executive Drive, Suite 1460
San Diego, CA 92121
voice 858.259.5009

with MACY'S as a sponsor. The call then ended.

59.     Later that day, on May 22, 2013, Riddick called and advised PRODUCER that Kuhl had instructed her to tell PRODUCER that MACY'S acknowledges that PRODUCER owns the TV Show, that MACY'S will comply with all of the Governing Laws, and that they will be making the payment of the second $100,000 invoice immediately.

60.     On May 30, 2012, while PRODUCER was already on the road for the start of the Tour, PRODUCER received word that MACY'S had, over the strict objections of PRODUCER and contrary to the representations of Riddick, issued a national Press Release, which referred to "The Macy's Great American Chefs Tour." That Press Release made no mention of PRODUCER.

61.     The Tour commenced on May 30, 2012, in Seattle and continued to San Francisco, Las Vegas, Los Angeles, San Diego, Miami, and Atlanta, ending on June 10, 2012. During that period, there were 8 Tour events, resulting in the taping of 14 episodes of the TV Show. Throughout the Tour, PRODUCER had countless problems with MACY'S, including a lack of preparedness and organization, poor management and communications, and staff and venue lack of readiness. On top of that, PRODUCER had an almost daily battle with MACY'S representatives who continually attempted to force MACY'S presence and logos into the body of the TV Show, in blatant violation of the Governing Laws. At the same time, PRODUCER received threats from KUHL and Stern that PRODUCER must comply with their requirements for placement in the TV Show or that they would pull out of their sponsorship.

62.     On June 5, 2012, Riddick contacted PRODUCER with requests to renegotiate the Purchase Order and to further revise the Tour schedule and the chefs included in the Tour. The demands communicated by Riddick (which she stated were dictated by Kuhl and Stern) were completely unacceptable to PRODUCER and would have caused PRODUCER to be in violation of the Governing Laws.

63.     On June 10, 2012, PRODUCER sent MACY'S the third invoice for

WIRTZ LAW APC
4365 Executive Drive, Suite 1460
San Diego, CA 92121
voice 858.259.5009

$100,000 for its sponsorship of GACT.

64.     On June 14, 2012, Christina Pagones of WTTW called PRODUCER and stated that Riddick had contacted her (by phone and email) to inquire why the TV Show could not be called "Macy's Great American Chefs Tour." WTTW responded by referring Riddick to PRODUCER since they have a contractual relationship with PRODUCER and cannot be in direct communications with third parties, especially sponsors of GACT.

65.     On June 15, 2012, PRODUCER received a call from Kuhl who threatened that unless PRODUCER agreed to changes to the Purchase Order that she was now demanding, they would pull out of their sponsorship deal. She said that they "are desperate" to have a TV program about their culinary programs and that if PRODUCER does not meet their demands, MACY'S will go out and produce one on their own. After PRODUCER stated that all efforts would be made to accommodate MACY'S requests, within the limits permitted by the Governing Laws, PRODUCER then stated that the Tour would be suspended unless MACY'S delivered the signed Purchase Order and the payments of the second and third invoices. At that point, Kuhl stated that she had the Purchase Order and the $100,000 checks on her desk and that she would sign both that day and send them by overnight delivery to PRODUCER. Later that day, PRODUCER received a draft version of the Purchase Order from Stern, which contained multiple revisions of the Purchase Order that PRODUCER had signed in April 2012.

66.     On June 16, 2012, PRODUCER received an overnight envelope from MACY'S which contained a check in the amount of $100,000 which stated "2nd 20% - Great American Chef" as the description. That envelope did not contain the signed Purchase Order.

67.     On June 19, 2012, PRODUCER had a conference call with representatives of WTTW and APT in order to get a better feel for what would or would not be allowed in terms of involvement of MACY'S in the TV Show, per the Governing Laws. The

WIRTZ LAW APC
4365 Executive Drive, Suite 1460
San Diego, CA 92121
voice 858.259.5009

results of that call were communicated directly to MACY'S by PRODUCER, who informed MACY'S that there could be no changes to the Purchase Order which would provide for anything in violation of the Governing Laws.

68.     Sometime in June 2012, O'DONNELL became directly involved in GACT. At no time prior to then had O'DONNELL had any involvement in the Tour or the TV Show or in any manner with PRODUCER. His involvement arose when he became concerned about the fact that MACY'S had not yet paid its sponsorship fees and that changes being demanded by MACY'S were driving up the cost of the production of the Tour and the TV Show. Over the course of June and July 2012, O'DONNELL inserted himself, over the objections of PRODUCER, into the relationships of PRODUCER, MACY'S, WHIRLPOOL, and ALEXANDER, among others. In so doing he attempted to renegotiate those relationships, for the benefit of LEC, DUMMLER, and himself.

69.     Over the course of June and July, 2012, PRODUCER attempted to negotiate a deal with MACY'S that would allow them to remain a sponsor of GACT. Those negotiations were primarily conducted by and through STERN, who continually expressed her displeasure with public television stations nationwide and the manner that they depend on public financing. She repeatedly proclaimed that GACT should be on commercial television where "a powerhouse like MACY'S can write their own rules."

70.     In an effort to get a signed Purchase Order that all of the parties could live with and to avoid the cancellation or suspension of the Tour, on June 20, 2012, PRODUCER delivered to Kuhl and Stern a proposed Amended Purchase Order, to replace the one signed in April 2012. KUHL responded that she would not sign that Purchase Order.

71.     On June 20, 2012, PRODUCER sent MACY'S a notice of material breach of the terms of the April 16, 2012 Purchase Order. That notice stated that if the Amended Purchase Order of that same date were signed and payment was promptly tendered, such breach would be deemed cured.

WIRTZ LAW APC
4365 Executive Drive, Suite 1460
San Diego, CA 92121
voice 858.259.5009

WIRTZ LAW APC
4365 Executive Drive, Suite 1460
San Diego, CA 92121
voice 858.259.5009

72.   On June 20, 2012, WTTW issued an email to numerous people, including PRODUCER and DUMMLER, setting forth the delivery dates and schedules for the airing of the TV Show, confirming that the first episode would air on September 8, 2012. That email also set forth several other requirements that needed to be met in order to meet that schedule.

73.   On June 21, 2012, Stern called PRODUCER and stated that MACY'S does not believe that it has a binding agreement with PRODUCER and stated her belief that GACT should be sold to another network (other than to public television stations, which she believed are a waste of taxpayer money) and that she was talking to Kuhl later that day about Kuhl getting the show on NBC, where she claimed MACY'S has a very powerful connection and a strong relationship (given that MACY'S sponsored other shows on that network and NBC aired the Thanksgiving parade). Later that day, Stern called PRODUCER again and advised that Kuhl could not get NBC to take the TV Show but that MACY'S wanted to get the sponsorship deal wrapped up with PRODUCER right away. Stern stated that so long as she could get "language" in the Purchase Order that she would be sending later that day, the $100,000 check (for the 3rd invoice payment) would be sent by overnight mail.

74.   On June 21, 2012 (and on several occasions from June 21, 2012, through June 25, 2012), PRODUCER communicated to LEC, O'DONNELL, and DUMMLER that it had been decided by PRODUCER to suspend the Tour until such time as either MACY'S signed the Purchase Order and paid the third invoice or PRODUCER had found a new sponsor to replace MACY'S. PRODUCER explained to them in great detail how much money PRODUCER would lose if the Tour continued without MACY'S performance of its promises and how it would be better for all parties if the losses were cut short until these issues were resolved. PRODUCER also explained that it believed that it already had sufficient footage from the Tour stops that had already been complete and Pilot #2 to produce and deliver to WTTW and APT 13 episodes, for airing in Fall 2012. LEC, O'DONNELL, and DUMMLER, however, urged

PRODUCER to continue with the Tour (at least for the Miami and Atlanta visits that had been scheduled for June 23 and 24, 2012) and requested that PRODUCER rely on them and have confidence in them that they would be able to get MACY'S to perform its obligations. Based on those requests and assurances, PRODUCER decided to continue the Tour for at least the Miami and Atlanta Tour stops.

75.     On June 25, 2012, after the Miami and Atlanta Tour stops, due to the fact that MACY'S had not signed the Purchase Order and had not made its required payment of the third invoice, the Tour was suspended in Atlanta. PRODUCER shipped all of the equipment of LEC, together with all of the materials of PRODUCER for the production of the Tour and TV Show to LEC's offices in Chicago, to be held there for PRODUCER. All of the staff of PRODUCER, ALEXANDER, and the LEC staff were flown to their respective home cities. At that point, DUMMLER informed PRODUCER that LEC would hold the raw tapes, post-produced products, and other production assets of the episodes that had been taped as well as the personal property of PRODUCER that was used or intended to be used in the production of the Tour and TV Show, including but not limited to sets, set decorations, equipment, appliances, hardware, and other materials used in the production of the Tour and the TV Show (all of which shall be referred to herein collectively as the "CCT Assets") until they were advised by PRODUCER where to send them. PRODUCER consented to LEC holding the CCT Assets temporarily until it could be determined where they should be sent.

76.     PRODUCER learned that in July 2012, MACY'S proceeded with several of the Tour events that had been cancelled, holding them in their own stores, using the chefs that were to be utilized by PRODUCER. Despite warnings of copyright and trademark infringement and theft of intellectual property, MACY'S proceeded with those events and called them "The Macy's Great American Chefs Tour."

77.     PRODUCER has requested that LEC turn over custody of the CCT Assets, so that PRODUCER could take all steps necessary for the completion of the episodes of the TV Show that had been shot and the delivery of such episodes for the

WIRTZ LAW APC
4365 Executive Drive, Suite 1460
San Diego, CA 92121
voice 858.259.5009

presentation and airing of the TV Show, as well as the completion of those episodes that had not yet been taped. LEC has and continues to refuse to release to PRODUCER all or any part of the CCT Assets.

78. At a hearing in the San Diego Superior Court on November 27, 2012, LEC asserted that it is still holding the CCT Assets and that it would not release them to PRODUCER because LEC was concerned that MACY'S and/or WHIRLPOOL may hold or claim to hold some interest that precludes LEC from returning to PRODUCER all or at least some portion of the CCT Assets, including most particularly but not limited to the footage of the taped programs which is necessary for PRODUCER to obtain in order to edit the material for broadcast purposes. In a sworn declaration of DUMMLER submitted in opposition to PRODUCER's attempt to secure an order compelling LEC to deliver to PRODUCER the CCT Assets, DUMMLER admitted the following:

a. That PRODUCER is the creator and producer of the Tour and the TV Show;

b. That Macy's was merely intended to be a sponsor of the Tour and TV Show and that it had no ownership interest in either;

c. That LEC has been paid $111,623 by PRODUCER;

d. That he thought the Tour and TV Show would cost more than he had projected in his budget prepared for PRODUCER but did not disclose that fact to PRODUCER and deliberately concealed that information from PRODUCER;

e. That LEC, O'DONNELL, and he were aware of the fact that MACY'S had failed to sign the purchase order or to promptly pay PRODUCER its sponsorship fee and that such late payment had caused PRODUCER financial problems, and that LEC, O'DONNELL, and he decided to continue with the Tour and the taping of the TV Show knowing this information;

WIRTZ LAW APC
4365 Executive Drive, Suite 1460
San Diego, CA 92121
voice 858.259.5009

WIRTZ LAW APC
4365 Executive Drive, Suite 1460
San Diego, CA 92121
voice 858.259.5009

f.   That he and O'DONNELL contacted MACY'S directly in order to somehow get LEC paid directly by MACY'S or to otherwise address MACY'S failure to meet its sponsorship obligations to PRODUCER;

g.   That PRODUCER paid for the travel, lodging, meals, per diems, and other Tour-related production costs throughout LEC's involvement in the Tour;

h.   That PRODUCER caused the property of LEC and the CCT Assets to be shipped from Atlanta to Chicago on June 25, 2012 and that LEC took possession of all of those items when they arrived in Chicago;

i.   That LEC, O'DONNELL, and he turned over at least some of the CCT Assets to MACY'S; and

j.   That he and O'DONNELL have been in regular communications with MACY'S about the Tour and the TV Show.

79.   In December 2012, PRODUCER received several calls and emails from chefs who had appeared on the Tour as well as their respective representatives reporting that they have heard that episodes of the TV Show have already begun airing. They were upset with PRODUCER over the fact that they had not been notified in advance so that they could do some publicity of their own to promote their own restaurants (as they had been promised by PRODUCER that they would be allowed to do). Some even reported that they heard that the name of the TV Show had been changed and they were wondering why that had occurred. Others reported that they had received communications from ALEXANDER advising them that the show is airing.

80.   Googling by PRODUCER quickly revealed that MACY'S issued a press release on November 24, 2012 (3 days before the LEC appeared in this matter to protest an ex parte order that it turn over the CCT Assets to PRODUCER) announcing the 13 episode season of the "Macy's Great American Chefs Tour," to be broadcast on public broadcasting stations, using the footage shot on the Tour and owned by PRODUCER. That announcement even quoted verbatim the copyrighted text

describing the TV Show that was written by PRODUCER.

81.     Further searching revealed that for the past few months, ALEXANDER has been promoting her "new show"- which is the "Great American Chefs Tour"- on her web site and on her Facebook page. Those promotions include photos and video of ALEXANDER and other chefs, all shot during the Tour.

82.     Googling also revealed that several public broadcasting stations across the United States had already aired episodes of the TV Show and had other episodes on their schedules for airing in the near future, in cities that include New York, San Francisco, Miami, and Boston.

83.     PRODUCER was informed by some of the public television stations that it had contacted that they had received the TV Show from EPS.

84.     PRODUCER contacted EPS, who confirmed that they had contracted with LEC to distribute the TV Show and had, in fact, been distributing the TV Show to public broadcasting stations nationwide. EPS also informed PRODUCER that they had been made aware of PRODUCER'S ownership of the TV Show and that, before agreeing to distribute the TV Show, EPS had insisted on and obtained from LEC an agreement indemnifying EPS from any claims by PRODUCER that might arise out of their distribution of the TV Show.

85.     PRODUCER is informed and believes, and on that basis alleges, that LEC, DUMMLER, and O'DONNELL have also been in contact with various public television stations nationwide in an attempt to get them to air the TV Show and that they have misrepresented that they, MACY'S, and WHIRLPOOL produced and are the owners of the TV Show. PRODUCER is informed and believes, and on that basis alleges that, when inquiries have been made by public television stations that were previously aware of the TV Show what has happened to PRODUCER, LEC, DUMMLER, and O'DONNELL have represented that PRODUCER is no longer involved in the Tour or the TV Show and that they, MACY'S, and WHIRLPOOL are the sole owners and producers.

WIRTZ LAW APC
4365 Executive Drive, Suite 1460
San Diego, CA 92121
voice 858.259.5009

86.   PRODUCER is informed and believes, and on that basis alleges that, in an effort to deceive the public and public television stations, in some instances, LEC, O'DONNELL, DUMMLER, MACY'S, WHIRLPOOL, Kuhl, Stern, and ALEXANDER have referred to the TV Show as "America's Chefs On Tour" (and various other names) but that the content, by whatever name they are using, is the TV Show.

87.   On January 3, 2012, PRODUCER put all of the Defendants on notice that it was aware of the use by them of PRODUCER's intellectual property and the CCT Assets and demanded that they immediately cease and desist from such activities.

## FIRST CLAIM FOR RELIEF

### Breach of Contract

### (Against Defendants MACY's and Does 1 through 100, inclusive)

88.   PRODUCER re-alleges and incorporates each of the foregoing paragraphs and the allegations contained therein as though set forth in full at this point.

89.   On or about January 2012, MACY's and PRODUCER entered into an oral contract.  The terms of the oral contract are set forth in the Purchase order attached as **Exhibit 1** and the Powerpoint presentation attached as **Exhibit 2.**

90.   By doing the acts alleged herein, MACY'S and Does 1 through 100, inclusive have breached the oral contract with Producer.

91.   Plaintiffs have performed all obligations required in the contract Macy Contract.

92.   As a result of ALEXANDER's breaches of the Alexander Contract, as alleged above, PRODUCER has been damaged in an amount to be proven at the trial of this action.  Those damages include specifically the loss of the CCT Assets, the loss of the opportunity to distribute the TV Show for airing commencing during the fall 2012 television season, and the potential termination of the opportunity to distribute the TV Show (both the current episodes as well as future seasons of the TV Show) at any time in the future, of which ALEXANDER was specifically aware.

93.   As a direct, proximate, and legal result of the breaches by MACY'S and

Does 1 through 100, inclusive, Plaintiffs have been damaged in an amount according to proof at trial, plus prejudgment interest.

## SECOND CLAIM FOR RELIEF

### Breach of Contract

### (Against Defendants LEC, O'DONNELL,

### DUMMLER, and Does 1 through 100, inclusive)

94.     PRODUCER re-alleges and incorporates each of the foregoing paragraphs and the allegations contained therein as though set forth in full at this point.

95.     LEC, O'DONNELL, and DUMMLER have failed and refused, and continue to fail and refuse, to turn over any of the CCT Assets to PRODUCER despite repeated demands by PRODUCER therefor.   In addition, as disclosed by LEC's opposition to the ex parte motion by PRODUCER to have LEC turn over the CCT Assets, LEC, O'DONNELL, and DUMMLER have apparently transferred possession of some or all of the CCT Assets to third parties (perhaps MACY'S and/or WHIRLPOOL). As a result, LEC, O'DONNELL, and DUMMLER materially breached their contract with PRODUCER.

96.     Plaintiffs have performed all obligations required in the contract Macy Contract.

97.     As a result of LEC's breaches of contract, as alleged above, PRODUCER has been damaged in an amount to be proven at the trial of this action.  Those damages include specifically the loss of the CCT Assets, the loss of the opportunity to distribute the TV Show for airing commencing during the fall 2012 television season, and the potential termination of the opportunity to distribute the TV Show (both the current episodes as well as future seasons of the TV Show) at any time in the future, of which LEC was specifically aware.

98.     As a direct, proximate, and legal result of the breaches by MACY'S and Does 1 through 100, inclusive, Plaintiffs have been damaged in an amount according to proof at trial, plus prejudgment interest.

### THIRD CLAIM FOR RELIEF

**Breach of Contract**

**(Against Defendant DEVIN ALEXANDER, INC. and ALEXANDER and Does 1 through 100, inclusive)**

99.    PRODUCER re-alleges and incorporates each of the foregoing paragraphs and the allegations contained therein as though set forth in full at this point.

100.    By participating in the completion and distribution of the TV Show by persons or entities other than PRODUCER, by participating in the marketing and promotion of the TV Show by persons or entities other than PRODUCER, by aiding and assisting LEC, DUMMLER, O'DONNELL, MACY'S, and WHIRLPOOL in converting and otherwise expropriating the CCT Assets, in addition to other activities of ALEXANDER and DEVIN ALEXANDER, INC. (collectively "ALEXANDER") associated with or connected to the foregoing activities, ALEXANDER has breached and continues to breach the Alexander Contract.

101.    Plaintiffs have performed all obligations required in the contract Macy Contract.

102.    As a result of ALEXANDER's breaches of the Alexander Contract, as alleged above, PRODUCER has been damaged in an amount to be proven at the trial of this action. Those damages include specifically the loss of the CCT Assets, the loss of the opportunity to distribute the TV Show for airing commencing during the fall 2012 television season, and the potential termination of the opportunity to distribute the TV Show (both the current episodes as well as future seasons of the TV Show) at any time in the future, of which ALEXANDER was specifically aware.

103.    As a direct, proximate, and legal result of the breaches by MACY'S and Does 1 through 100, inclusive, Plaintiffs have been damaged in an amount according to proof at trial, plus prejudgment interest.

/ / /

/ / /

WIRTZ LAW APC
4365 Executive Drive, Suite 1460
San Diego, CA 92121
voice 858.259.5009

# FOURTH CLAIM FOR RELIEF

## Intentional Misrepresentation

### (Against LEC, MACY'S, DEVIN ALEXANDER, INC.,
### ALEXANDER, O'DONNELL, and DUMMLER
### and Does 1 through 100, inclusive)

104.   PRODUCER re-alleges and incorporates each of the foregoing paragraphs and the allegations contained therein as though set forth in full at this point.

105.   Defendants LEC, MACY'S, DEVIN ALEXANDER, INC., ALEXANDER, O'DONNELL, and DUMMLER knowingly made false statements as alleged above in to induce the actions by PRODUCER, all as specifically alleged above, including, but not limited to inducing PRODUCER to proceed with the Tour and the taping of the TV Show and allowing them to retain temporary possession of the CCT Assets, while their intention was to take the CCT Assets and use them for their own benefit and to attempt to steal the intellectual property and other rights and interests of PRODUCER for their own profit.

106.   Defendants LEC, MACY'S, DEVIN ALEXANDER, INC., ALEXANDER, O'DONNELL, and DUMMLER intended that PRODUCER rely on such false statements to PRODUCER's detriment.

107.   PRODCUER relied on such representations by, among other things, producing the Tour and the TV Show and making all of the necessary arrangements and payments therefore, as alleged above.

108.   PRODUCER reasonably relied upon the false statements of LEC, MACY'S, DEVIN ALEXANDER, INC., ALEXANDER, O'DONNELL, and DUMMLER to PRODUCER's detriment and to the benefit of LEC, MACY'S, O'DONNELL, and DUMMLER.

109.   PRODUCER has suffered damages as a result of such reliance.  The precise amount of these damages is not presently ascertainable but exceeds the sum of $5,000,000.00.

WIRTZ LAW APC
4365 Executive Drive, Suite 1460
San Diego, CA 92121
voice 858.259.5009

110.   The aforementioned conduct of LEC, MACY'S, DEVIN ALEXANDER, INC., ALEXANDER, O'DONNELL, and DUMMLER was an intentional misrepresentation, deceit or concealment of material facts known to LEC, MACY'S, O'DONNELL, and DUMMLER and statements made by LEC, MACY'S, O'DONNELL, and DUMMLER, with the intention of depriving PRODUCER of PRODUCER's rights, and was performed in a conscious disregard of those rights and were willfully wanton, oppressive, and malicious, so as to justify an award of exemplary and punitive damages.

**FIFTH CLAIM FOR RELIEF**

**Negligent Misrepresentation**

**(Against LEC, MACY'S, DEVIN ALEXANDER, INC.,**

**ALEXANDER, O'DONNELL, and DUMMLER**

**and Does 1 through 100, inclusive)**

111.   PRODUCER re-alleges and incorporates each of the foregoing paragraphs and the allegations contained therein as though set forth in full at this point.

112.   Defendants LEC, MACY'S, DEVIN ALEXANDER, INC., ALEXANDER, O'DONNELL, and DUMMLER made false statements and representations to PRODUCER, as alleged above.

113.   When Defendants LEC, MACY'S, DEVIN ALEXANDER, INC., ALEXANDER, O'DONNELL, and DUMMLER made such false statements and representations, they had no reasonable ground for believing them to be true and made them with the intent to induce PRODUCER to act in reliance of those statements and representations, in the manner herein alleged.

114.   PRODUCER relied on these false statements, as PRODUCER was ignorant of the falsity of such statements and representations.  Had PRODUCER known that those statements and representations of Defendants LEC, MACY'S, O'DONNELL, and DUMMLER were false, PRODUCER would not have taken the actions that he took in reliance thereon. PRODUCER's reliance on the representations

WIRTZ LAW APC
4365 Executive Drive, Suite 1460
San Diego, CA 92121
voice 858.259.5009

of Defendants LEC, MACY'S, DEVIN ALEXANDER, INC., ALEXANDER, O'DONNELL, and DUMMLER was justified and reasonable.

115.   As a direct and proximate result of the acts alleged above, PRODUCER has suffered damages in an amount according to proof.  The precise amount of these damages is not presently ascertainable but exceeds the sum of $5,000,000.00.

116.   The aforementioned conduct of Defendants LEC, MACY'S, DEVIN ALEXANDER, INC., ALEXANDER, O'DONNELL, and DUMMLER was an intentional misrepresentation, deceit or concealment of material facts known to Defendants LEC, MACY'S, DEVIN ALEXANDER, INC., ALEXANDER, O'DONNELL, and DUMMLER with the intention of depriving PRODUCER the rights and benefits of the ownership of PRODUCER's property and was performed in a conscious disregard of PRODUCER's rights and were willfully wanton, oppressive, and malicious, so as to justify an award of exemplary and punitive damages.  The aforementioned conduct of Defendants LEC, MACY'S, DEVIN ALEXANDER, INC., ALEXANDER , O'DONNELL, and DUMMLER was a substantial factor in causing PRODUCER's harm.

## SIXTH CLAIM FOR RELIEF

### Conversion

### (Against all Defendants and Does 1 through 100, inclusive)

117.   PRODUCER re-alleges and incorporates each of the foregoing paragraphs and the allegations contained therein as though set forth in full at this point.

118.   At all times relevant herein, PRODUCER had and now has exclusive possessory right to the CCT Assets.

119.   Defendants have, notwithstanding such exclusive possessory rights of PRODUCER in and to the CCT Assets, and notwithstanding PRODUCER's demands for return of the said items, failed and refused to do so, and instead have retained them in their own possession.

120.   In November 2012, PRODUCER learned that Defendants have turned

WIRTZ LAW APC
4365 Executive Drive, Suite 1460
San Diego, CA 92121
voice 858.259.5009

over possession of some or all of the CCT Assets to MACY's and/or WHIRLPOOL.

121.   In December 2012, PRODUCER learned that Defendants have been using and distributing the CCT Assets for airing on public broadcasting stations nationwide, for their own benefit.

122.   As result of this conversion by the said Defendants of the CCT Assets, PRODUCER has been damaged in an amount to be proven at the trial of this action. The precise amount of these damages is not presently ascertainable but exceeds the sum of $5,000,000.00.

123.   The actions of Defendants, as alleged herein, were oppressive, fraudulent, and malicious, in that they were taken with a conscious disregard for the legitimate rights of PRODUCER, of which they were well aware.  Accordingly, PRODUCER is entitled, in addition to an award of actual damages here, to an award of exemplary damages against these Defendants.

## SEVENTH FOR RELIEF

### Trademark Infringement

### (Against all Defendants and Does 1 through 100, inclusive)

124.   PRODUCER re-alleges and incorporates each of the foregoing paragraphs and the allegations contained therein as though set forth in full at this point.

125.   PRODUCER is the owner of the federally registered GREAT AMERICAN CHEFS TOUR trademark, Reg. No. 4145234. At all times relevant to this action, Defendants have been aware that PRODUCER is the mark owner. PRODUCER told Defendants of its federally registered trademark in its initial meetings with MACY'S personnel.  PRODUCER has requested Defendants cease and desist from its act of trademark infringement and has given Defendants actual notice of PRODUCER's registration, but Defendant have refused to cease such acts.

126.   Defendants have used and are using PRODUCER's registered mark in connection with the distribution, and/or advertising of a television show in such a manner as to cause actual confusion, as is likely to cause confusion, or to cause

WIRTZ LAW APC
4365 Executive Drive, Suite 1460
San Diego, CA 92121
voice 858.259.5009

mistake, or to deceive consumers or potential consumers in violation of 15 U.S.C. § 1114. Defendants have used the mark in press releases, on their web sites, and in promotions of the Tour and TV Show. In addition, to the extent that the mark appears in any of the footage of the TV Show, such acts are an infringement. Said use of said names and marks by Defendants is without permission or authority of PRODUCER and said use by Defendant is likely to cause confusion, to cause mistake, and to deceive the public.

127.   By reason of Defendants' acts alleged herein, PRODUCER has and will suffer damage to its business, reputation and good will and the loss of sales and profits PRODUCER would have made but for Defendants' acts. Defendants have committed and are continuing to commit trademark infringement in violation of 15 U.S.C. §1114. As a direct and proximate result of Defendants' conduct, Plaintiff is entitled, pursuant to 15 U.S.C. §1117(a), to recovery of: (i) Defendants' profits related to all uses of PRODUCER's GREAT AMERICAN CHEFS TOUR trademark, and any and all iterations thereof; (ii) any damages sustained by Plaintiff as a result of Defendants' conduct, the precise amount of which shall be established by Plaintiff at trial; and (iii) the costs of the action herein. The precise amount of these damages is not presently ascertainable but exceeds the sum of $5,000,000.00. Plaintiff is also entitled to the recovery of its attorney's fees to 15 U.S.C. §1117.

128.   PRODUCER has been, is now, and will be irreparably injured and damaged by Defendants' trademark infringement. In addition to PRODUCER's profits which have been and will be diverted to Defendants as a result of consumer confusion, PRODUCER's trademark serves a unique function in representing intangible assets of Plaintiff such as its reputation and good will. Unless enjoined by the Court, PRODUCER will suffer further harm to its reputation, and goodwill each and every day that Defendants continue to use PRODUCER's mark in connection with the distribution, promotion, and/or advertising of their competing television show. The past, present, and in particular future harm to Plaintiff's reputation and good will is

WIRTZ LAW APC
4365 Executive Drive, Suite 1460
San Diego, CA 92121
voice 858.259.5009

difficult to value and therefore constitutes an injury for which Plaintiff has no adequate remedy at law.

129.   Plaintiff seeks a preliminary and permanent injunction to prohibit Defendants from any further use of any mark confusingly similar to Plaintiff's GREAT AMERICAN CHEFS TOUR trademark, or any iterations thereof, including "American Chef's On Tour," in connection with any television program and/or tour, without Plaintiff's express written consent in advance.

130.   The actions of Defendants, as alleged herein, were oppressive, fraudulent, and malicious, in that they were taken with a conscious disregard for the legitimate rights of PRODUCER, of which they were well aware.  Accordingly, PRODUCER is entitled, in addition to an award of actual damages here, to an award of exemplary damages against Defendants.

## EIGHTH FOR RELIEF

### Federal False Designation of Origin

### (15 U.S.C. § 1125 (a))

### (Against all Defendants and Does 1 through 100, inclusive)

131.   PRODUCER re-alleges and incorporates each of the foregoing paragraphs and the allegations contained therein as though set forth in full at this point.

132.   Defendants have used and are using GREAT AMERICAN CHEFS TOUR in connection with the distribution, and/or advertising of a television show in such a manner as to cause actual confusion, as is likely to cause confusion, or to cause mistake, or to deceive consumers or potential consumers as to the affiliation, connections, or association of Defendant with PRODUCER, or as to the origin, sponsorship, or approval of Defendants' television show by PRODUCER in violation of 15 U.S.C. § 1125(a). Defendants have used GREAT AMERICAN CHEFS TOUR in press releases, on their web sites, and in promotions of a Tour and TV Show. In addition, to the extent that GREAT AMERICAN CHEFS TOUR appears in any of the footage of the TV Show, such acts are false designations of origin. Said use of GREAT

WIRTZ LAW APC
4365 Executive Drive, Suite 1460
San Diego, CA 92121
voice 858.259.5009

AMERICAN CHEFS TOUR by Defendants is without permission or authority of PRODUCER and said use by Defendant is likely to cause confusion, to cause mistake, and to deceive the public.

133.   By reason of Defendants' acts alleged herein, PRODUCER has and will suffer damage to its business, reputation and good will and the loss of sales and profits PRODUCER would have made but for Defendants' acts.  As a direct and proximate result of Defendants' conduct, Plaintiff is entitled, pursuant to 15 U.S.C. §1117(a), to recovery of: (i) Defendants' profits related to all uses of GREAT AMERICAN CHEFS TOUR, and any and all iterations thereof; (ii) any damages sustained by Plaintiff as a result of Defendants' conduct, the precise amount of which shall be established by Plaintiff at trial; and (iii) the costs of the action herein.  The precise amount of these damages is not presently ascertainable but exceeds the sum of $5,000,000.00. Plaintiff is also entitled to the recovery of its attorney's fees to 15 U.S.C. §1117.

134.   PRODUCER has been, is now, and will be irreparably injured and damaged by Defendants' acts as alleged herein.  In addition to PRODUCER's profits which have been and will be diverted to Defendants as a result of consumer confusion, PRODUCER's GREAT AMERICAN CHEFS TOUR mark serves a unique function in representing intangible assets of Plaintiff such as its reputation and good will. Unless enjoined by the Court, PRODUCER will suffer further harm to its reputation, and goodwill each and every day that Defendants continue to use PRODUCER's GREAT AMERICAN CHEFS TOUR mark in connection with the distribution, promotion, and/or advertising of their competing television show.  The past, present, and in particular future harm to Plaintiff's reputation and good will is difficult to value and therefore constitutes an injury for which Plaintiff has no adequate remedy at law.

135.   Plaintiff seeks a preliminary and permanent injunction to prohibit Defendants from any further use of any mark confusingly similar to Plaintiff's GREAT AMERICAN CHEFS TOUR mark, or any iterations thereof, including "American Chef's On Tour," in connection with any television program and/or tour, without

WIRTZ LAW APC
4365 Executive Drive, Suite 1460
San Diego, CA 92121
voice 858.259.5009

1  Plaintiff's express written consent in advance.

2      136.   The actions of Defendants, as alleged herein, were oppressive, fraudulent,

3  and malicious, in that they were taken with a conscious disregard for the legitimate

4  rights of PRODUCER, of which they were well aware.  Accordingly, PRODUCER is

5  entitled, in addition to an award of actual damages here, to an award of exemplary

6  damages against Defendants.

## NINTH CLAIM FOR RELIEF

### Federal Trademark Dilution

### (15 U.S.C. § 1125 (c))

### (Against all Defendants and Does 1 through 100, inclusive)

11     137.   PRODUCER re-alleges and incorporates each of the foregoing paragraphs

12 and the allegations contained therein as though set forth in full at this point.

13     138.   PRODUCER's GREAT AMERICAN CHEFS TOUR trademark is a

14 famous mark that is widely recognized by consumers, distributors, and others in the

15 industry. The mark was presented to nationwide public television stations in May 2011

16 and generated quite a bit of excitement.  All but one agreed to air the program when it

17 was completed.  In addition, in November 2011 at the APT Fall Marketplace the mark

18 had a substantial presence.  During that event PRODUCER and WTTW met with

19 representatives of virtually every major public television station and every major US

20 television market to present the GREAT AMERICAN CHEFS TOUR TV Show and

21 tour.  Two pilots of the GREAT AMERICAN CHEFS TOUR TV Show were shot at

22 live events. The GREAT AMERICAN CHEFS TOUR commenced on May 30, 2012,

23 in Seattle and continued to San Francisco, Las Vegas, Los Angeles, San Diego, Miami,

24 and Atlanta, ending on June 10, 2012. During that period, there were 8 GREAT

25 AMERICAN CHEFS TOUR events, resulting in the taping of 14 episodes of the

26 GREAT AMERICAN CHEFS TOUR TV Show.

27     139.   Defendants' unauthorized use of the mark began after PRODUCER's

28 mark had become famous.  Plaintiffs are informed and believe that Defendants began

WIRTZ LAW APC
4365 Executive Drive, Suite 1460
San Diego, CA 92121
voice 858.259.5009

to shoot new episodes and hold live events using PRODUCER's mark in or about July 2012.

140.   Defendants' unauthorized use of the mark has and will continue to have an adverse effect upon the value and distinctive quality of the GREAT AMERICAN CHEFS TOUR trademark. Defendants' acts blur and whittle away at the distinctiveness and identity-evoking quality of the GREAT AMERICAN CHEFS TOUR trademark. Defendants' acts have diluted and are likely to continue diluting the famous mark in violation of 15 U.S.C. § 1125(c).

141.   PRODUCER has been, is now, and will be irreparably injured and damaged by Defendants' trademark infringement.  In addition to PRODUCER's profits which have been and will be diverted to Defendants as a result of consumer confusion, PRODUCER's trademark serves a unique function in representing intangible assets of Plaintiff such as its reputation and good will. Unless enjoined by the Court, PRODUCER will suffer further harm to its reputation, and goodwill each and every day that Defendants continue to use PRODUCER's mark in connection with the distribution, promotion, and/or advertising of their competing television show.  The past, present, and in particular future harm to Plaintiff's reputation and good will is difficult to value and therefore constitutes an injury for which Plaintiff has no adequate remedy at law. Accordingly, Plaintiff is entitled to preliminary and permanent injunctive relief pursuant to 15 U.S.C. § 1125(c)(2).

142.   Defendants have committed and are continuing to commit trademark dilution in violation of 15 U.S.C. §1125(c).  As a direct and proximate result of Defendants' conduct, Plaintiff is entitled, pursuant to 15 U.S.C. §1117(a), to recovery of: (i) Defendants' profits related to all uses of PRODUCER's GREAT AMERICAN CHEFS TOUR trademark, and any and all iterations thereof; (ii) any damages sustained by Plaintiff as a result of Defendants' conduct, the precise amount of which shall be established by Plaintiff at trial; and (iii) the costs of the action herein.  The precise amount of these damages is not presently ascertainable but exceeds the sum of

WIRTZ LAW APC
4365 Executive Drive, Suite 1460
San Diego, CA 92121
voice 858.259.5009

$5,000,000.00. Plaintiff is also entitled to the recovery of its attorney's fees to 15 U.S.C. §1117.

143.   The actions of Defendants, as alleged herein, were oppressive, fraudulent, and malicious, in that they were taken with a conscious disregard for the legitimate rights of PRODUCER, of which they were well aware. Accordingly, PRODUCER is entitled, in addition to an award of actual damages here, to an award of exemplary damages against Defendants.

## TENTH CLAIM FOR RELIEF

### Common Law Unfair Competition

### (Against all Defendants and Does 1 through 100, inclusive)

144.   PRODUCER re-alleges and incorporates each of the foregoing paragraphs and the allegations contained therein as though set forth in full at this point.

145.   By virtue of Defendants' acts, as pleaded above, Defendants have engaged in unfair competition with PRODUCER.

146.   As a result of Defendants' unfair competition, PRODUCER has incurred damages in an amount to be proven at trial consisting of, among other things, diminution in the value of good will associated with PRODUCER and its mark.

147.   The actions of Defendants, as alleged herein, were oppressive, fraudulent, and malicious, in that they were taken with a conscious disregard for the legitimate rights of PRODUCER, of which they were well aware. Accordingly, PRODUCER is entitled, in addition to an award of actual damages here, to an award of exemplary damages against Defendants.

## ELEVENTH CLAIM FOR RELIEF

### California Unfair Competition Law: Violation of Business and Professions Code §§ 17200 et seq.

### (Against all Defendants and Does 1 through 100, inclusive)

148.   PRODUCER re-alleges and incorporates each of the foregoing paragraphs and the allegations contained therein as though set forth in full at this point.

WIRTZ LAW APC
4365 Executive Drive, Suite 1460
San Diego, CA 92121
voice 858.259.5009

149.   By virtue of Defendants' acts as pleaded above, Defendants have engaged in unfair competition in violation of California Business and Professions Code §§17200, et seq.

150.   Defendants' acts of unfair competition and false advertising have caused and continue to cause irreparable injury to the value and goodwill of PRODUCER's mark, as well as to PRODUCER's business, goodwill and reputation. Defendant's actions, if not enjoined, will continue through the same channels of trade used by PRODUCER and to the same customers targeted by PRODUCER. PRODUCER has no adequate remedy at law in that the amount of its damages is difficult to ascertain with certainty.

151.   As a result of Defendants' acts of unfair competition and false advertising, PRODUCER has incurred damages in an amount to be proven at trial consisting of, among other things, actual diversion of its trade and diminution in the value of goodwill associated with PRODUCER and PRODUCER's mark.

152.   The actions of Defendants, as alleged herein, were oppressive, fraudulent, and malicious, in that they were taken with a conscious disregard for the legitimate rights of PRODUCER, of which they were well aware. Accordingly, PRODUCER is entitled, in addition to an award of actual damages here, to an award of exemplary damages against Defendants.

153.   In addition, PRODUCER is entitled under the provisions of the said Business and Professions Code §§ 17200 et seq. to an award of its reasonable attorney's fees in this matter, in an amount to be determined by the Court.

## TWELFTH CLAIM FOR RELIEF

### Misappropriation of Ideas- Implied In Fact Contract

### (Against all Defendants and Does 1 through 100, inclusive)

154.   PRODUCER re-alleges and incorporates each of the foregoing paragraphs and the allegations contained therein as though set forth in full at this point.

155.   The   acts   of   defendants,   as   alleged   hereinabove,   constitute

COMPLAINT

40

WIRTZ LAW APC
4365 Executive Drive, Suite 1460
San Diego, CA 92121
voice 858.259.5009

Misappropriation of Ideas and Breach of Implied-in-Fact Contract.

156.   By reason of Defendants' acts alleged herein, PRODUCER has and will suffer damage to its business, reputation and good will and the loss of sales and profits PRODUCER would have made but for Defendants' acts.

157.   Defendants threaten to continue to do the acts complained of herein, and unless restrained and enjoined, will continue to do so, all to PRODUCER's irreparable damage.  It would be difficult to ascertain the amount of compensation which could afford PRODUCER adequate relief for such continuing acts, and a multiplicity of judicial proceedings would be required.  PRODUCER's remedy at law is not adequate to compensate it for injuries threatened.

158.   As result of this misappropriation by Defendants, PRODUCER has been damaged in an amount to be proven at the trial of this action. The precise amount of these damages is not presently ascertainable but exceeds the sum of $5,000,000.00.

159.   The actions of Defendants, as alleged herein, were oppressive, fraudulent, and malicious, in that they were taken with a conscious disregard for the legitimate rights of PRODUCER, of which they were well aware.  Accordingly, PRODUCER is entitled, in addition to an award of actual damages here, to an award of exemplary damages against Defendants.

## THIRTEENTH CLAIM FOR RELIEF

### Intentional Tortious Interference With Contractual Relationships

### (Against Defendants MACY'S, WHIRLPOOL, LEC, EPS, DUMMLER, O'DONNELL, and Does 1 through 100, inclusive)

160.   PRODUCER re-alleges and incorporates each of the foregoing paragraphs and the allegations contained therein as though set forth in full at this point.

161.   Defendants MACY'S, WHIRLPOOL, LEC, DUMMLER, AND O'DONNELL, and each of them, knew of PRODUCER's existing contracts and business relationships with, among others, ALEXANDER, WTTW, APT, chefs, and public broadcasting stations.

162.   Despite knowing of these contracts and existing business relationships, said Defendants, and each of them, intentionally interfered with those contracts and business relationships.

163.   By reason of said Defendants' acts alleged herein, PRODUCER has and will suffer damage to its business, reputation and good will and the loss of sales and profits PRODUCER would have made but for Defendants' acts.

164.   Said Defendants threaten to continue to do the acts complained of herein, and unless restrained and enjoined, will continue to do so, all to PRODUCER's irreparable damage.  It would be difficult to ascertain the amount of compensation which could afford PRODUCER adequate relief for such continuing acts, and a multiplicity of judicial proceedings would be required.  PRODUCER's remedy at law is not adequate to compensate it for injuries threatened.

165.   As result of the acts of said Defendants, PRODUCER has been damaged in an amount to be proven at the trial of this action. The precise amount of these damages is not presently ascertainable but exceeds the sum of $5,000,000.00.

166.   The actions of said Defendants, as alleged herein, were oppressive, fraudulent, and malicious, in that they were taken with a conscious disregard for the legitimate rights of PRODUCER, of which they were well aware.  Accordingly, PRODUCER is entitled, in addition to an award of actual damages here, to an award of exemplary damages against Defendants.

## FOURTEENTH CLAIM FOR RELIEF

### Intentional Tortious Interference With Prospective Business Relationships
### (Against Defendants MACY'S, WHIRLPOOL, LEC, EPS, DUMMLER, and
### O'DONNELL, and Does 1 through 100, inclusive)

167.   PRODUCER re-alleges and incorporates each of the foregoing paragraphs and the allegations contained therein as though set forth in full at this point.

168.   Defendants   MACY'S,   WHIRLPOOL,   LEC,   DUMMLER,   and O'DONNELL and each of them, knew of PRODUCER's on-going and prospective

W I R T Z   L A W APC
4365 Executive Drive, Suite 1460
San Diego, CA 92121
voice 858.259.5009

business relationships with, among others, ALEXANDER, WTTW, APT, chefs, and public broadcasting stations.

169.    Despite knowing of these ongoing and prospective business relationships, said Defendants, and each of them, intentionally interfered with those ongoing and prospective and business relationships.

170.    By reason of said Defendants' acts alleged herein, PRODUCER has and will suffer damage to its business, reputation and good will and the loss of sales and profits PRODUCER would have made but for Defendants' acts.

171.    Said Defendants threaten to continue to do the acts complained of herein, and unless restrained and enjoined, will continue to do so, all to PRODUCER's irreparable damage.  It would be difficult to ascertain the amount of compensation which could afford PRODUCER adequate relief for such continuing acts, and a multiplicity of judicial proceedings would be required.  PRODUCER's remedy at law is not adequate to compensate it for injuries threatened.

172.    As result of the acts of said Defendants, PRODUCER has been damaged in an amount to be proven at the trial of this action. The precise amount of these damages is not presently ascertainable but exceeds the sum of $5,000,000.00.

173.    The actions of said Defendants, as alleged herein, were oppressive, fraudulent, and malicious, in that they were taken with a conscious disregard for the legitimate rights of PRODUCER, of which they were well aware.  Accordingly, PRODUCER is entitled, in addition to an award of actual damages here, to an award of exemplary damages against Defendants.

## FIFTEENTH CLAIM FOR RELIEF

### Negligent Tortious Interference With Contractual Relationships

### (Against Defendants MACY'S, WHIRLPOOL, LEC, EPS, DUMMLER, O'DONNELL, and Does 1 through 100, inclusive)

174.    PRODUCER re-alleges and incorporates each of the foregoing paragraphs and the allegations contained therein as though set forth in full at this point.

WIRTZ LAW APC
4365 Executive Drive, Suite 1460
San Diego, CA 92121
voice 858.259.5009

175.   Defendants MACY'S, WHIRLPOOL, LEC, DUMMLER, and O'DONNELL, and each of them, knew or should reasonably have known of PRODUCER's existing contracts and business relationships with, among others, ALEXANDER, WTTW, APT, chefs, and public broadcasting stations.

176.   Despite knowing of these contracts and existing business relationships, said Defendants, and each of them, intentionally interfered with those contracts and business relationships.

177.   By reason of said Defendants' negligent interference with PRODUCER's contractual relationships, as alleged herein, PRODUCER has and will suffer damage to its business, reputation and good will and the loss of sales and profits PRODUCER would have made but for Defendants' acts.

178.   Said Defendants threaten to continue to do the acts complained of herein, and unless restrained and enjoined, will continue to do so, all to PRODUCER's irreparable damage.  It would be difficult to ascertain the amount of compensation which could afford PRODUCER adequate relief for such continuing acts, and a multiplicity of judicial proceedings would be required.  PRODUCER's remedy at law is not adequate to compensate it for injuries threatened.

179.   As result of the acts of said Defendants, PRODUCER has been damaged in an amount to be proven at the trial of this action. The precise amount of these damages is not presently ascertainable but exceeds the sum of $5,000,000.00.

180.   The actions of said Defendants, as alleged herein, were oppressive, fraudulent, and malicious, in that they were taken with a conscious disregard for the legitimate rights of PRODUCER, of which they were well aware.  Accordingly, PRODUCER is entitled, in addition to an award of actual damages here, to an award of exemplary damages against Defendants.

/ / /

/ / /

/ / /

WIRTZ LAW APC
4365 Executive Drive, Suite 1460
San Diego, CA 92121
voice 858.259.5009

WIRTZ LAW APC
4365 Executive Drive, Suite 1460
San Diego, CA 92121
voice 858.259.5009

## SIXTEENTH CLAIM FOR RELIEF

### Negligent Tortious Interference With Prospective Business Relationships

### (Against Defendants MACY'S, WHIRLPOOL, LEC, EPS, DUMMLER, O'DONNELL, and Does 1 through 100, inclusive)

181.   PRODUCER re-alleges and incorporates each of the foregoing paragraphs and the allegations contained therein as though set forth in full at this point.

182.   Defendants MACY'S, WHIRLPOOL, LEC, DUMMLER, and O'DONNELL, and each of them, knew or should reasonably have known of PRODUCER's ongoing and prospective business relationships with, among others, ALEXANDER, WTTW, APT, chefs, and public broadcasting stations.

183.   Despite knowing of these contracts and existing business relationships, said Defendants, and each of them, intentionally interfered with those contracts and business relationships.

184.   By reason of said Defendants' negligent interference with PRODUCER's ongoing and prospective business relationships, as alleged herein, PRODUCER has and will suffer damage to its business, reputation and good will and the loss of sales and profits PRODUCER would have made but for Defendants' acts.

185.   Said Defendants threaten to continue to do the acts complained of herein, and unless restrained and enjoined, will continue to do so, all to PRODUCER's irreparable damage.  It would be difficult to ascertain the amount of compensation which could afford PRODUCER adequate relief for such continuing acts, and a multiplicity of judicial proceedings would be required.  PRODUCER's remedy at law is not adequate to compensate it for injuries threatened.

186.   As result of the acts of said Defendants, PRODUCER has been damaged in an amount to be proven at the trial of this action. The precise amount of these damages is not presently ascertainable but exceeds the sum of $5,000,000.00.

187.   The actions of said Defendants, as alleged herein, were oppressive, fraudulent, and malicious, in that they were taken with a conscious disregard for the

legitimate rights of PRODUCER, of which they were well aware.  Accordingly, PRODUCER is entitled, in addition to an award of actual damages here, to an award of exemplary damages against Defendants.

## SEVENTEENTH CLAIM FOR RELIEF

### Declaratory Relief

### (Against Defendants MACY'S, WHIRLPOOL, LEC, EPS, and Does 1 through 100, inclusive)

188.   PRODUCER re-alleges and incorporates each of the foregoing paragraphs and the allegations contained therein as though set forth in full at this point.

189.   An actual controversy has arisen and now exists between PRODUCER and Defendant LEC and DOES 1 through 100, inclusive, in that the said LEC claims to have some possessory right, lien, or other property interest in the CCT Assets. PRODUCER disputes these claims, and asserts to the contrary that it has full and exclusive right to possession of all of the CCT Assets. PRODUCER disputes these claims, and alleges that Defendant LEC has no good cause or reason, under the LEC Agreement or otherwise, to withhold all or any portion of the CCT Assets from PRODUCER, on its own behalf or because of any alleged claim belonging to any other person or entity.

190.   PRODUCER is informed by LEC, and based upon such information alleges, that Defendants MACY'S and/or WHIRLPOOL may likewise assert some interest or other claim to all or some of the CCT Assets.  If this is so, PRODUCER likewise disputes any such claim, and instead asserts that the sole and exclusive right to possession of the entirety of the CCT Assets lies with PRODUCER and no other person or entity.

191.   A judicial determination of the parties' respective rights and obligations with respect to the CCT Assets is necessary and appropriate at this time, in order that the parties may ascertain their respective rights with regard to the said items.  Said determination will also inform any ruling on PRODUCER's Claim for Relief herein for

WIRTZ LAW APC
4365 Executive Drive, Suite 1460
San Diego, CA 92121
voice 858.259.5009

1  Conversion, as set forth below.

2       192.   PRODUCER accordingly seeks a declaration from this Court as to the

3  parties' respective rights in and to any possessory interest in the CCT Assets.

4       **WHEREFORE,** PRODUCER prays for relief as follows:

5       1.    For damages in an amount to be proven at trial;

6       2.    For an order directing the return of all property illegally converted

7             and withheld from PRODUCER, including the CCT Assets;

8       3.    For such injunctive relief as may deemed necessary to prevent

9             irreparable harm to PRODUCER;

10      4.    For a declaration of the rights and obligations of the parties with

11            regard to the parties' respective rights and interests in and to

12            possession of the CCT Assets;

13      5.    For an accounting of all profits of the Defendants derived from the

14            use of PRODUCER's copyrights, trademarks and other intellectual

15            property;

16      6.    For exemplary damages as allowed by law;

17      7.    For an award of reasonable attorney's fees as allowed under the

18            terms of the LEC Agreement, the Alexander Agreement, and as

19            allowed by common law and/or by statute;

20      8.    For interest thereon as allowed by law; and

21      9.    For such other and further relief as the Court may in its discretion

22            deem just and proper.

23                                        Respectfully Submitted,

24  DATED:    June 17, 2013             **WIRTZ LAW** APC

25

26

27                                       Richard M. Wirtz
                                         Attorneys for Plaintiffs
28

WIRTZ LAW APC
4365 Executive Drive, Suite 1460
San Diego, CA 92121
voice 858.259.5009



# PURCHASE ORDER

**Promark Productions, LLC ("Promark"):**
Address:  PO Box 1083
      La Jolla, CA  92038
Contact:  Gary Ravet
Telephone:  858-551-2999
Fax:   858-777-5476
Email:  Gravet@promarkproductions.com

**Macy's Parade & Entertainment Group, a Division of Macy's Corporate Services, Inc. ("Macy's"):**
Address:  11 Penn Plaza
      11th Floor
      New York, NY 10001
Contact:  Stacy Rosenthal
Telephone:  646-429-7426
Fax:   646-429-5020
Email:  Stacy.Rosenthal@macys.com

**Program:** "Great American Chefs Tour" (See Exhibit "A" for detailed description)

**Compensation:** Five Hundred Thousand Dollars ($500,000), payable as follows:
**Terms:**

- 20% within ten (10) days of execution and delivery of this Purchase Order;
- 20% upon the commencement of the "Tour," as defined, which is part of the Program;
- 20% upon the completion of first leg of the Tour (June 20, 2012);
- 20% upon completion of the final leg of the Tour (estimated July 14, 2012);
- 20% upon the commencement of the airing of the television show that is part of the Program;
- Each of the foregoing payments is subject to receipt by Macy's of a detailed and acceptable invoice; Invoices shall be deemed received when delivered to Macy's, which delivery may be by fax or email to Macy's if acknowledged by the recipient; and
- All payments required pursuant to this Purchase Order shall be made net on the dates set forth herein.

This Purchase Order includes the terms annexed and is hereby agreed to by the parties as of April 16, 2012 (the "Effective Date.")

Macy's Parade & Entertainment Group, a Division of
Macy's Corporate Services, Inc.

Promark Productions LLC

By: _____      By: _____
Name (Print)              Name (Print)


Signature              Signature


Title      Date          Title      Date

## ADDITIONAL TERMS & CONDITIONS OF PURCHASE ORDER

1) **Program:** The Program is described on Exhibit "A" attached hereto and incorporated herein and includes all of the elements set forth therein.

2) **Representations and Warranties:** The parties hereby represent and warrant to each other that each:

   a) Has full authority to enter into and be bound by the terms of this Purchase Order;

   b) Shall comply with all applicable federal, state, county and local laws, ordinances, regulations, and codes ("Applicable Law") in the performance of its obligations under this Purchase Order; and

   c) Shall indemnify, defend and hold (as the "Indemnitor") the other, its "Affiliates" (as defined herein), and the officers, directors, employees, agents, insurers, contractors (other than the other party hereto) and each of their respective successors and assigns (collectively, the "Indemnitees"), harmless from and against any and all claims, actions, proceedings, judgments, expenses, damages, and liabilities, including reasonable attorneys' fees and expenses, arising in connection with a breach hereof, including of any representation and/or warranty, or any other act or omission of the Indemnitor with respect to the services to be provided hereunder except to the extent determined in a final, non-appealable order to be due to due to negligence or misconduct of an Indemnitee. For purposes hereof, an "Affiliate" is an entity that controls, is controlled by or under common control with another entity and control is the power to appoint a majority of its governing body, by ownership or otherwise.

3) **IP Representation and Warranty:** Both parties represent and warrant that the Program, in whole and/or in any part, and any promotion or advertising thereof will not infringe or violate any copyright, trademark, trade secret, patent, or other intellectual property or other property right (hereinafter ("IP") of the other party or any third party and will not violate any right of privacy or publicity of the other party or any third party, and will not be defamatory, libelous, hateful, or obscene or otherwise actionable. This Section 3 shall survive the expiration or earlier termination of this Purchase Order.

4) **Confidentiality:**

   a) The parties agree that Promark shall receive access to certain Macy's information that Macy's regards as its valuable, non-public, confidential, proprietary or trade secret information, which includes technical, computer-related information, financial and/or sales data, and transactional information, including material that has not been marked as "CONFIDENTIAL" but that a reasonable person would recognize as confidential (in whole and in any part, the "Confidential Information") but only for the production of the Program (the "Permitted Use"). The parties intend that such Confidential Information will be protected from any use other than the Permitted Use and shall not be disclosed by Promark except to its employees on a "need-to-know" basis and then only after being advised that such Confidential Information is to be maintained secure from further disclosure or use except in accordance herewith. In order to effectuate such purpose, the only non-public Macy's information that may be excepted from the definition of Confidential Information shall be material that Promark is compelled to disclose pursuant to the order of a government entity such as a court. In that event, Promark shall give Macy's prior notice so that Macy's may seek an appropriate remedy prior to such disclosure unless Promark is prohibited from giving such notice. Neither party anticipates that Macy's will be providing any material that contains personal identifier information concerning individuals but if it is disclosed or if Promark otherwise obtains or ascertains any such information, Promark immediately shall advise Macy's and thereafter promptly comply with Macy's instructions with respect thereto. Promark represents and warrants that Confidential Information shall be used only for the Permitted Use and that Promark shall use the same measures to avoid publication, disclosure or dissemination of Macy's Confidential Information as Promark uses to protect its own critical confidential material, which measures shall be at least reasonable and not less stringent than those used by professionals employed in Promark's profession. When the Permitted Use is fulfilled, Promark shall so advise Macy's and, upon Macy's instructions, either shall destroy or return any and all Confidential Information then in Promark's direct or indirect possession; provided that, in no event whatsoever may any Confidential Information be disposed of as ordinary garbage but rather all Confidential Information and all tangible material containing any such Confidential Information shall be destroyed by shredding, burning, deletion of digital records or such other method that will render the Confidential Information unrecoverable and Promark promptly shall certify such destruction to Macy's in writing. In the event that any archived or automatically stored materials of Promark contain any Confidential Information, it may be disposed of in the course of Promark's document management program so long as such program requires that material be rendered unrecoverable and such tangible materials will remain subject to this Purchase Order until so rendered. Nothing in this Purchase Order grants or confers (or shall be construed as granting or conferring) any rights, by license or otherwise (express or implied), to Promark, in any Confidential Information or other material relating to Macy's. All material, including Macy's IP and/or any Confidential Information owned by Macy's or any Macy's Affiliate is and shall remain Macy's property. Further, Promark, without the prior consent of Macy's, shall not use any Macy's IP (i.e., any

name, trademark or trade name of Macy's or any of its Affiliates) in any manner without Macy's prior approval. This Section 4 shall survive the expiration or earlier termination of this Purchase Order. Promark shall not use or distribute any portion of the Program which includes the IP in any manner other than in accordance with the display, distribution, or promotion (approved in advance by Macy's) of a full episode of the Program or in accordance with approved promotion of the Tour. All uses of the IP, in any manner associated with the Program, on web sites or other media, shall be approved in advance in writing by Macy's.

b) The parties agree that Macy's shall receive access to certain Promark information that Promark regards as its valuable, non-public, confidential, proprietary or trade secret information, which includes technical material, computer-related information, financial and/or sales data, and transactional information, including material that has not been marked as "CONFIDENTIAL" but that a reasonable person would recognize as confidential (in whole and in any part, the "Confidential Information") but only for the production of the Program (the "Permitted Use"). The parties intend that such Confidential Information will be protected from any use other than the Permitted Use and shall not be disclosed by Macy's except to its employees on a "need-to-know" basis and then only after being advised that such Confidential Information is to be maintained secure from further disclosure or use except in accordance herewith. In order to effectuate such purpose, the only non-public Promark information that may be excepted from the definition of Confidential Information shall be material that Macy's is compelled to disclose pursuant to the order of a government entity such as a court. In that event, Macy's shall give Promark prior notice so that Promark may seek an appropriate remedy prior to such disclosure unless Macy's is prohibited from giving such notice. Neither party anticipates that Promark will be providing any material that contains personal identifier information concerning individuals but if it is disclosed or if Macy's otherwise obtains or ascertains any such information, Macy's immediately shall advise Promark and thereafter promptly comply with Promark's instructions with respect thereto. Macy's represents and warrants that Confidential Information shall be used only for the Permitted Use and that Macy's shall use the same measures to avoid publication, disclosure or dissemination of Promark's Confidential Information as Macy's uses to protect its own critical, confidential material, which measures shall be at least reasonable and not less stringent than those used by professionals employed in Macy's profession. When the Permitted Use is fulfilled, Macy's shall, so advise Promark and, upon Promark's instructions, either shall deliver or return any and all Confidential Information then in Macy's direct or indirect possession; provided that, in no event whatsoever may any Confidential Information be disposed of as ordinary garbage but rather all Confidential Information and all tangible material containing any such Confidential Information shall be destroyed by shredding, burning, deletion or digital records or such other method that will render the Confidential Information unrecoverable and Macy's promptly shall certify such destruction to Promark in writing. In the event that any archived or automatically stored materials of Macy's contain any Confidential Information, it may be disposed of in the course of Macy's document management program so long as such program requires that material be rendered unrecoverable and such tangible materials will remain subject to this Purchase Order until so rendered. Nothing in this Purchase Order grants or confers (or shall be construed as granting or conferring) any rights, by license or otherwise (express or implied), to Macy's, in any Confidential Information or other material relating to Promark. All material, including Promark's IP and/or any Confidential Information owned by Promark or any Promark Affiliate is and shall remain Promark's property. Further, Macy's, without the prior consent of Promark, shall not use any Promark's IP (i.e., any name, trademark or trade name of Promark, the Tour, or the Program) in any manner without Promark's prior approval. This Section 4 shall survive the expiration or earlier termination of this Purchase Order. All uses of or references to the Tour or the Program shall use the name "Great American Chefs Tour" together with the "TM" symbol, and shall state that the Tour and the Program are produced by Promark Productions, LLC. All press releases, publicity, promotion, and marketing of the Tour or the Program shall be approved in writing in advance of their use or dissemination by Promark and shall use the name "Great American Chefs Tour" together with the "TM" symbol, and shall state that the Tour and the Program are produced by Promark Productions LLC. No photographs or videos taken of or at the Tour, by Macy's or any person hired, associated with, or affiliated with, Macy's, shall be used for any non-private purpose, without the prior written consent of Promark as to that particular photograph and/or video.

5) **Miscellaneous:**

a) This Purchase Order may not be modified or amended, and no provision contained in it may be waived, except in writing signed by duly authorized officers of both parties. The failure of a party to require performance by the other shall not be deemed a waiver of such or a future breach unless such waiver is in writing. Waivers shall be narrowly construed, refer to this Purchase Order and be signed by the party against whom enforcement is sought. The waiver by any party of any right, power, contained in this Purchase Order shall not constitute a waiver of the terms and conditions of this Purchase Order with respect to any other right set forth in this Purchase Order or any other or subsequent breach thereof, nor a waiver by either party of its rights at any time thereafter to require exact and strict compliance with all the terms hereof. The rights and remedies of the parties under this Purchase Order are cumulative

to any other rights or remedies, which may be granted by law. Any rights and remedies, which the parties may have under this Purchase Order with respect to the unperformed obligations of a party or any of the representations and warranties set forth herein, shall survive the expiration or termination of this Purchase Order.

b) This is a contract for the personal services of Promark and Promark shall not delegate any duties or assign any benefits hereunder, or otherwise transfer any interest herein, without Macy's prior consent. Any purported assignment or delegation without such consent, whether by Purchase Order or operation of law (by merger or otherwise) shall be void and of no effect. This Purchase Order shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns. There are no third party beneficiaries except for Macy's Affiliates.

c) Unless noted, no exclusivity or advertising placement is hereby offered, promised, or granted by this Purchase Order.

d) In no event shall any IP of either party, if owned by such party prior to the Effective Date, be deemed transferred or assigned hereby. To the extent, if any that Promark creates any works for Macy's hereunder or with respect hereto, such works shall be original, non-infringing and either be and be deemed to be works made for hire within the meaning therefor of the copyright laws of the United States or be deemed assigned to Macy's in whole and without reservation, without further payment, and Promark shall do all things and take all actions as may be necessary or prudent to confirm such assignment and transfer to Macy's of such works. Notwithstanding the foregoing, no portion of the Tour or the Program shall be considered to be work for hire to which this paragraph applies.

e) The validity, interpretation, and performance of this Purchase Order shall be governed by and construed under the laws of the State of New York, without reference to its conflicts of laws doctrine. In the event of a dispute arising hereunder or with respect hereto, the parties shall endeavor to resolve the matter but if unable to do, exclusive jurisdiction shall lie in the federal and state courts within the County of New York and State of New York. Both parties waive any objection as to the personal jurisdiction of such courts or the convenience of any such forum. Each party further waives trial by jury in such a proceeding. Promark acknowledges that the unauthorized disclosure, use or disposition of Confidential Information could cause irreparable harm and significant injury to Macy's, the extent and value of which may be difficult to ascertain. Accordingly, the parties agree that, in addition to any other remedy that may be available to Macy's hereunder, at law or in equity, Macy's also shall have the right to seek expedited equitable relief in the event of Promark's breach or threatened breach of this Purchase Order. Remedies available to either party are and shall be deemed cumulative and may be exercised separately or concurrently. Neither party shall be liable to the other for any indirect, incidental, consequential or punitive damages, except as may arise in respect of indemnification.

f) Should any provision of this Purchase Order be deemed invalid for any reason, such invalidity shall not affect the validity of any other provisions hereof and the remaining provisions shall nevertheless continue in full force without being impaired or invalidated in any way to the extent remaining an enforceable contract under the laws of New York.

g) This Purchase Order, which includes its preamble and all exhibits and attachments (including all Schedules) annexed, constitutes the entire agreement between the parties with respect to the services referred to herein. Any prior agreements, representations, negotiations or undertakings dealing with the subject matter of this Purchase Order, written or oral, are superseded hereby.

h) The parties are independent contractors and nothing herein shall be deemed or construed to create a relationship of employer/employee, principal/agent, partnership, joint venture, or any other affiliation or association between them except that of independent contractors. Promark shall have no right to enter any contract or take any action on behalf of Macy's or to otherwise to obligate Macy's or create any duty or obligation to be owed by Macy's in any way.

i) All notices, requests, demands, and/or other communications required, permitted or contemplated hereunder, including consents and approvals and requests therefor ("notices" for purposes hereof), in order to be effective, shall be in writing and shall be deemed delivered when received. Such notices shall be delivered by hand or sent by receipted courier, US Mail (registered or certified, postage prepaid and return receipt requested) or by email or facsimile (with automatic confirmation of transmission; provided that, if delivered via electronic or facsimile, notices concerning breach or termination shall be followed be a confirming duplicate notice shall be delivered by hand or sent by courier or by registered or certified US Mail (postage prepaid and return receipt requested). Notices shall be sent to the addresses given herein or such other address as may be given in accordance with this provision; provided that, copies of notices to Macy's shall be directed to: Macy's Law Department, 11 Penn Plaza, 11ᵗʰ Floor, New York, NY 10001, Attention: Rachelle Stern, Esq. (rachelle.stern@macys.com).

j) The "Term" of this Purchase Order shall commence on the "Effective Date" and shall remain in effect (unless earlier terminated) for one (1) year after the Effective Date; provided that, the obligation to protect Confidential Information hereunder shall survive the expiration or earlier termination of this Purchase Order for not the later of five (5) years following the date of the last disclosure to Promark or the date that such information no longer retains its status as Confidential Information.

k) All persons employed by Promark to provide services in connection with the Program shall be Promark employees and not Macy's employees. Promark, together with any such persons employed by Promark, shall comply with all United States federal, state, and As to Promark and such Promark's employees: (i) Promark shall procure and maintain workers' compensation coverage sufficient to meet the statutory requirements of every state where Promark assigns personnel to visit any Macy's Store; (ii) Promark shall ensure that each of its employees and contractors, if any, is informed of and complies with the terms of this Purchase Order and shall be liable hereunder for any failure by any of them to so comply.     To the extent required to confirm its compliance with the terms of this Purchase Order, Promark hereby agrees to provide Macy's independent auditors with access to its books and records with respect to the subject matter hereof for the full period of confidentiality provided for in respect of Confidential Information other that personal identifier information (i.e., five (5) years after the last disclosure).

l) For purposes of this Purchase Order, except as otherwise expressly specified or as the context may otherwise require: (i) terms stated with initial capitalization are to be construed in accordance with definition provided herein, if any; (ii) each reference to the "Agreement" or "Purchase Order" shall be construed as including each and every term, condition and provision hereof, including in any exhibits attached and amendments made; (iii) terms such as "include" and "including" are used and are to be construed as inclusive and without limitation; (iv) terms such as "hereunder," "thereunder," "hereinafter," "herein" and like references are to the entire Agreement or Purchase Order, as applicable, including any amendments. This Purchase Order is to be construed as though drafted by both parties and not to be construed against the interest of either party.

m) Promark shall maintain, at its sole cost and expense, insurance that is reasonably sufficient to cover its assets and liabilities, including its obligations hereunder, in accordance with Exhibit A.

n) The provisions of this Purchase Order that specify that they shall survive the Term or by which, by their nature (e.g., provisions in respect of indemnification, confidentiality and/or remedies) shall extend beyond the Term and remain in effect thereafter until all obligations with respect thereto are satisfied and/or all applicable periods of limitation have expired.

o) This Purchase Order may be executed in counterparts, each of which shall be deemed an original and all of which, when taken together, shall constitute the same instrument and, upon its execution and delivery by both parties, this Purchase Order shall be binding upon such parties and their respective successors and assigns.

p) This Section 5 shall survive the Term.