1

2

3

4

5

6

7

8

9 **UNITED STATES DISTRICT COURT**

10 **SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CELEBRITY CHEFS TOUR, LLC, a California limited liability company; and PROMARK PRODUCTIONS, LLC, a California limited liability company,<br><br>                    Plaintiffs,<br><br>vs.<br><br><br><br>MACY'S, INC, a Delaware corporation; WHIRLPOOL CORPORATION, a Delaware corporation; LEC MEDIA, LLC, an Illinois limited liability company; EXECUTIVE PROGRAM SERVICES, INC., a Washington corporation; JACK O'DONNELL, an individual; SCOTT DUMMLER, an individual; DEVIN ALEXANDER, INC, a California corporation; DEVIN ALEXANDER, a.k.a. RENEE SIMONE, an individual; and DOES 1–10, inclusive,<br><br>                    Defendants. | CASE NO. 13-CV-2714 JLS (KSC)<br><br>**ORDER: (1) GRANTING DEFENDANTS DEVIN ALEXANDER AND DEVIN ALEXANDER, INC.'S REQUEST FOR JUDICIAL NOTICE; (2) GRANTING PLAINTIFFS' REQUEST FOR JUDICIAL NOTICE; AND (3) GRANTING IN PART AND DENYING IN PART DEFENDANTS DEVIN ALEXANDER AND DEVIN ALEXANDER, INC.'S MOTION TO DISMISS PLAINTIFFS' COMPLAINT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)**<br><br>(ECF Nos. 15, 36) |

Presently before the Court is Defendants Devin Alexander, a.k.a. Renee Simone ("Alexander"), and Devin Alexander, Inc.'s ("DAI," and, collectively, "Alexander Defendants") Motion to Dismiss ("MTD") Plaintiffs Celebrity Chefs Tour, LLC ("CCT") and Promark Productions, LLC's ("Promark," and, collectively, "Plaintiffs") Complaint Pursuant to Federal Rule of Civil Procedure 12(b)(6). (ECF No. 15.) Also before the Court are Alexander Defendants' Request for Judicial Notice ("RJN") (ECF No. 15-2), Plaintiffs' RJN (ECF No. 36), and Plaintiffs' Response in Opposition to (ECF No. 40) and Alexander Defendants' Reply in Support of (ECF No. 42-1) the Motion. The hearing for the Motion was vacated and the matter taken under submission without oral argument pursuant to Civil Local Rule 7.1.d.1. (ECF No. 54.) Having considered the parties' arguments and the law, the Court **GRANTS** both Alexander Defendants' and Plaintiffs' RJNs and **GRANTS IN PART AND DENIES IN PART** Alexander Defendants' MTD.

## BACKGROUND

Plaintiffs, both California limited liability companies, are the producer of a live tour ("the Tour") and a television series filmed on the Tour called "The Great American Chef's Tour" ("GACT," or, "the Show"). (Compl. ¶¶ 1, 2, 13, ECF No. 1.) Plaintiffs allegedly created the concept for GACT in 2008 and own all of the copyrights for GACT. (*Id.* ¶ 14.) Plaintiffs also own the trademark and service mark for GACT. (*Id.* ¶ 16.)

In August 2011, Plaintiffs and Window to the World Communications, Inc. ("WTTW")—"a leading public television station and producer and distributor of content to public television stations nationwide"—entered into a contract whereby WTTW was to present and distribute twenty-six (26) episodes of GACT, to begin airing in the spring of 2012. (*Id.* ¶¶ 17, 22.) The first pilot generated generally positive feedback. (*Id.* ¶ 21.) Thereafter, Plaintiffs began soliciting potential sponsors for the Tour and GACT, including Macy's, Inc. ("Macy's), a Delaware Corporation. (*Id.* ¶¶ 25, 3.)

In October 2011, Plaintiffs contacted Alexander about auditioning as the host of GACT. (*Id.* ¶ 47.) Alexander is a resident of Los Angeles who owns DAI, a California corporation. (*Id.* ¶¶ 9–10.) Alexander expressed her interest in the role. (*Id.*) All other parties involved in GACT were pleased to have Alexander serve as the host. (*Id.*)

In October and November 2011, Plaintiffs presented the GACT concept to Stacy Rosenthal ("Rosenthal"), Macy's director of special events, and her superiors Amy Kuhl ("Kuhl") and Martine Reardon ("Reardon"). (*Id.* ¶¶ 26–28.) Plaintiffs agreed to certain accommodations, including altering their schedule to accommodate Macy's needs and incorporating Macy's name as the title sponsor of the Tour. (*Id.* ¶ 28.) Macy's was cautioned that Federal Communications Commission ("FCC") laws and regulations, however, would not permit its name to appear in the TV show. (*Id.*) On November 9, 2011, Rosenthal and Kelly Lainsbury ("Lainsbury") informed Plaintiffs that Macy's had approved a $500,000 sponsorship. (*Id.* ¶ 30.)

On January 6, 2012, Rosenthal requested, and Plaintiffs sent, a copy of the Tour schedule and a purchase order for the Macy's sponsorship ("the Purchase Order," or, "the Macy's Contract"). (*Id.* ¶ 34.) On February 22, 2012, Macy's approved the Purchase Order and requested an invoice for a first payment of $100,000. (*Id.* ¶ 35.)

Macy's had previously asked Plaintiffs if it could present its potential involvement to other companies, and Plaintiffs had agreed. (*Id.* ¶ 33.) On March 14, 2012, Rosenthal informed Plaintiffs that Macy's had entered into an agreement with Whirlpool Corporation ("Whirlpool"), a Delaware corporation, which would be a promotional partner of Macy's, but not Plaintiffs. (*Id.* ¶ 38.)

On April 14, 2012, Plaintiffs received a signed contract from Alexander ("the Alexander Contract"), who had agreed to host GACT. (*Id.* ¶ 47.) On April 16, 2012, Plaintiffs staged a live event that provided the footage for the second pilot of GACT, with Alexander as the host. (*Id.* ¶ 42.) The same day, Plaintiffs signed and returned to Macy's the Purchase Order. (*Id.* ¶ 43.) Rosenthal acknowledged receipt of the signed Purchase Order and informed Plaintiffs that "she would have Kuhl sign it as soon as

possible." (*Id.*)

On April 19, 2012, Plaintiffs contacted LEC Media, LLC ("LEC"), an Illinois limited liability company, and Scott Dummler ("Dummler"), an Illinois resident and LEC executive, to "discuss[] the possibility of hiring them to do the editing of Pilot No. 2 and to and do [*sic*] the filming of the Tour as well as the possible post-production work on [GACT]." (*Id.* ¶¶ 5, 8, 48.) In or about April 2012, the parties allegedly reached an agreement, never reduced to a formal written contract, whereby LEC would be the independent contractor editor of Pilot No. 2 and the independent contractor production company for the filming of the Tour. (*Id.*) Plaintiffs allege that there was a mutual understanding that all intellectual property was to remain Plaintiffs' exclusive property. (*Id.*)

On April 26, 2012, Plaintiffs received Macy's first $100,000 sponsorship payment. (*Id.* ¶ 45.) On May 4, 2012, Lainsbury informed Plaintiffs that Kuhl was insisting that chefs associated with Macy's be included at each Tour stop, and that the Tour events be held in Macy's stores whenever possible. (*Id.* ¶ 49.) Plaintiffs explained that FCC laws and regulations would not permit Macy's to have editorial control over content. (*Id.*) Lainsbury cautioned Plaintiffs that they should "never say no to" Kuhl, who was "used to getting her way." (*Id.*)

On May 8, 2012, Plaintiffs met with Dummler and representatives of WTTW to discuss the show and some of the problems Plaintiffs were having with Macy's. (*Id.* ¶ 50.) Dummler acknowledged that he and LEC would ensure that Macy's specifically and GACT generally remained in compliance with the applicable laws. (*Id.*)

The Tour was scheduled to begin in Seattle on May 30, 2012, and to end in Chicago in mid-July. (*Id.* ¶ 51.) Throughout May, Plaintiffs contacted Macy's, without much success, "about the need to confirm Tour venues, cities, chefs and other arrangements." (*Id.*) On May 13, 2012, Plaintiffs sent Macy's its second $100,000 invoice. (*Id.* ¶ 52.)

On May 17, 2012, Plaintiffs learned that Macy's had created the logo "Macy's

Great American Chef's Tour," and warned Macy's that Plaintiffs owned the GACT trademark and that the logo Macy's designed would not be used on the Tour or in the show.  (*Id.* ¶ 53.)  On May 18, 2012, Plaintiffs spoke to Rosenthal, who confided that she was thinking about quitting Macy's because Kuhl was "intolerable."  (*Id.* ¶ 54.) Rosenthal purportedly warned Plaintiffs that Kuhl was scheming to take control, and possibly ownership, of GACT.  (*Id.*)

On May 21, 2012, Plaintiffs were informed that Rosenthal had quit and that Jodi Riddick ("Riddick"), Rosenthal's former assistant, would be taking over her position. (*Id.* ¶ 56.)  Plaintiffs worked with Whirlpool, at Macy's request, to make changes to the stage kitchen to include Whirlpool appliances.  (*Id.* ¶ 57.)  Whirlpool was informed that it could not be a sponsor because its appliances would be visible.  (*Id.*)

On May 22, 2012, Kuhl called Plaintiffs and accused them of changing their deal with Macy's and insisted on having Macy's name appear on the Tour and in the show, leading Plaintiffs to threaten to cancel the Tour.  (*Id.* ¶ 58.)  Later that same day, Riddick called and told Plaintiffs that Macy's would comply with its agreement and all applicable laws, and that Macy's would send the second sponsorship payment immediately.  (*Id.* ¶ 59.)  Yet, on May 30, 2012, Plaintiffs learned that Macy's had issued a national press released touting "Macy's Great American Chefs Tour."  (*Id.* ¶ 60.)  Nonetheless, the Tour commenced as scheduled, with eight (8) events resulting in the filming of fourteen (14) episodes of GACT between May 30, 2012 and June 10, 2012.  (*Id.* ¶ 61.)  During this time, however, Plaintiffs' problems with Macy's continued.  (*Id.*)

On June 10, 2012, Plaintiffs sent Macy's the third sponsorship invoice.  (*Id.* ¶ 63.)  On June 15, 2012, Kuhl called Plaintiffs and threatened to pull out of the sponsorship unless Plaintiffs agreed to comply with her demands.  (*Id.* ¶ 65.)  Plaintiffs stated that they would, "within the limits permitted by the Governing Laws," accommodate her requests, but threatened to suspend the Tour if Macy's did not make its second and third payments and return the signed Purchase Order.  (*Id.*)  Kuhl told

Plaintiffs that she would send the documents by overnight delivery.  (*Id.*)  However, the draft version of the Purchase Order that Plaintiffs received later that day "contained multiple revisions."  (*Id.*)  The second sponsorship payment arrived the following day, unaccompanied by a signed Purchase Order.  (*Id.* ¶ 66.)

Through June and July 2012, Plaintiffs negotiated with Macy's in an attempt to retain it as a sponsor.  (*Id.* ¶ 69.)  On June 20, 2012, Plaintiffs provided an amended Purchase Order, which Kuhl refused to sign.  (*Id.* ¶ 70.)  That same day, Plaintiffs sent Macy's a notice of material breach of the April 16, 2012 Purchase Order.  (*Id.* ¶ 71.)

On June 21, 2012, Plaintiffs informed LEC, Jack O'Donnell ("O'Donnell")—LEC's president and CEO—and Dummler that the Tour was suspended until Macy's tendered its sponsorship payments or until Plaintiffs could find a new sponsor.  (*Id.* ¶ 74.)  LEC, O'Donnell, and Dummler purportedly urged Plaintiffs to continue the tour and expressed that they would be able to get Macy's to fulfill its contractual obligations.  (*Id.*)  Plaintiffs continued the Tour for two more stops, but on June 25, 2012, having not received payment from Macy's, Plaintiffs suspended the Tour.  (*Id.* ¶ 75.)  Subsequently, Plaintiffs sent the "sets, set decorations, equipment, appliances, hardware, and other materials used in the production of the Tour and the TV Show" ("the CCT Assets") to LEC, which LEC told Plaintiffs it would hold "temporarily until it could be determined where they should be sent."  (*Id.*)

In July 2012, Macy's continued with some of the cancelled tour events under the name "Macy's Great American Chefs Tour."  (*Id.* ¶ 76.)  In December 2012, Plaintiffs heard from several chefs who had appeared on the Tour that several episodes of GACT had already begun to air.  (*Id.* ¶ 79.)  Thereafter, Plaintiffs learned that on November 24, 2012, Macy's released a press release announcing a thirteen (13)-episode season of "Macy's Great American Chefs Tour."  (*Id.* ¶ 80.)  Plaintiffs also learned that Alexander had been promoting "her new show," which promotions included photographs and videos shot during the Tour.  (*Id.* ¶ 81.) Further, Plaintiffs confirmed that several public broadcasting stations had already aired episodes of GACT.  (*Id.* ¶

82.)  These stations informed Plaintiffs that they had received GACT from Executive Program Services, Inc. ("EPS").  (*Id.* ¶ 83.)

Plaintiffs contacted EPS, which confirmed that it had contracted with LEC to distribute GACT.  (*Id.* ¶ 84.)  EPS informed Plaintiffs that it had known that Plaintiffs owned GACT and that it had insisted on obtaining an indemnification agreement from LEC before agreeing to distribute the Show.  (*Id.*)

Plaintiffs allege that LEC, Dummler, and O'Donnell contacted various television stations to get them to air GACT, and that they misrepresented to these stations that they, Macy's, and Whirlpool—and not Plaintiffs—produced and owned GACT.  (*Id.* ¶ 85.)  In an attempt to disguise this deception, Plaintiffs allege that Defendants have at times referred to GACT by the name "America's Chefs On Tour," or other, similar names.  (*Id.* ¶ 86.)

On January 3, 2013, Plaintiffs demanded that Defendants cease and desist from using Plaintiffs' intellectual property.  (*Id.* ¶ 87.)  Plaintiffs have also requested that LEC relinquish custody of the CCT Assets, but without success.  (*Id.* ¶ 77.)  Accordingly, on June 19, 2013, Plaintiffs instituted this action in the U.S. District Court for the Central District of California.  (*See generally* Compl., ECF No. 1.)  On September 3, 2013, Defendants filed motions to dismiss for improper venue pursuant to Federal Rule of Civil Procedure 12(b)(3).  (ECF Nos. 10–14.)  On the same day, Defendants filed motions to dismiss the case for lack of personal jurisdiction or failure to state a claim pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6), respectively.  (ECF Nos. 15–21.)

On November 4, 2013, Judge John A. Kronstadt held a hearing on Defendants' motions.  (ECF No. 49.)  On November 12, 2013, Judge Kronstadt granted Defendants' Rule 12(b)(3) motions and transferred the case to this District.  (Order 11, ECF No. 50.)  Subsequently, this Court reinstated Defendants' Rule 12(b)(2) and 12(b)(6) motions and took the matters under submission.  (ECF No. 54.)

///

## REQUESTS FOR JUDICIAL NOTICE

Federal Rule of Evidence 201 provides that "[t]he court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." "Judicially noticed facts often consist of matters of public record." *Botelho v. U.S. Bank, N.A.*, 692 F. Supp. 2d 1174, 1178 (N.D. Cal. 2010) (citations omitted); *see also W. Fed. Sav. & Loan Ass'n v. Heflin Corp.*, 797 F. Supp. 790, 792 (N.D. Cal. 1992). While "a court may take judicial notice of the existence of matters of public record, such as a prior order or decision," it should not take notice of "the truth of the facts cited therein." *Marsh v. Cnty. of San Diego*, 432 F. Supp. 2d 1035, 1043 (S.D. Cal. 2006).

Alexander Defendants ask the Court to judicially notice the following seven (7) documents, all filed in the action *Celebrity Chefs Tour LLC v. LEC Media, LLC, et al.*, Case No. 37-2012-00085275-CU-BC-CTL, Superior Court of the State of California, County of San Diego: (1) Plaintiff's Complaint, filed on November 13, 2012; (2) Plaintiff's First Amended Complaint (Verified), filed on January 8, 2013; (3) Declaration of Scott Dummler in Opposition to Plaintiffs' *Ex Parte* Motion for Temporary Restraining Order, filed on November 27, 2012; (4) Register of Actions Docket; (5) Minute Order on Plaintiffs' *Ex Parte* Application for Temporary Restraining Order, filed on November 27, 2012; (6) Minute Order on Plaintiffs' *Ex Parte* Application for Temporary Restraining Order, filed on January 10, 2013; and (7) Minute Order on Plaintiffs' *Ex Parte* Application for Temporary Restraining Order, filed on January 31, 2013. Alexander Defendants also ask the Court to judicially notice the following four (4) documents, all filed with the United States Patent and Trademark Office: (1) Trademark/Service Mark Application for "Great American Chefs Tour," Serial No. 85284912, filed on April 4, 2011; (2) Office Action regarding Trademark Application Serial No. 85284912; (3) Response to Office Action regarding Trademark Application Serial No. 85284912; and (4) Trademark Registration No. 4,145,234,

1  registered May 22, 2012.

2      Plaintiffs ask the Court to judicially notice the following four (4) documents, all

3  filed in the action *Celebrity Chefs Tour LLC v. LEC Media, LLC, et al.*, Case No. 37-

4  2012-00085275-CU-BC-CTL, Superior Court of the State of California, County of San

5  Diego: (1) Declaration of Scott Dummler in Opposition to Plaintiffs' *Ex Parte* Motion

6  for Temporary Restraining Order, filed on November 27, 2012; (2) Supplemental

7  Declaration of Gary Ravet in Support of Plaintiffs' *Ex Parte* Motion for Temporary

8  Restraining Order, filed December 4, 2012; (3) Declaration of Brian J. Dunn in Support

9  of Plaintiffs' *Ex Parte* Motion for Temporary Restraining Order, filed January 30, 2013;

10  and (4) Reporter's Transcript of January 10, 2013 Hearing.

11      All of these documents are available to the public and are certified and

12  maintained by an official office.  Their accuracy cannot therefore be reasonably

13  disputed.  Accordingly, the Court **GRANTS** Alexander Defendants' RJN as to all

14  eleven (11) documents and **GRANTS** Plaintiffs' RJN as to all four (4) documents.

15  However, the Court does not take notice of the truth of the facts asserted therein.

**MOTION TO DISMISS**

17  **I.      Legal Standard**

18      Federal Rule of Civil Procedure 12(b)(6) permits a party to raise by motion the

19  defense that the complaint "fail[s] to state a claim upon which relief can be granted,"

20  generally referred to as a motion to dismiss.  The Court evaluates whether a complaint

21  states a cognizable legal theory and sufficient facts in light of Federal Rule of Civil

22  Procedure 8(a), which requires a "short and plain statement of the claim showing that

23  the pleader is entitled to relief."  Although Rule 8 "does not require 'detailed factual

24  allegations,' . . . it [does] demand[] more than an unadorned, the-defendant-unlawfully-

25  harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl.*

26  *Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  In other words, "a plaintiff's obligation

27  to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and

28  conclusions, and a formulaic recitation of the elements of a cause of action will not do."

*Twombly*, 550 U.S. at 555 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 557).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570); *see also* Fed. R. Civ. P. 12(b)(6). A claim is facially plausible when the facts pled "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). That is not to say that the claim must be probable, but there must be "more than a sheer possibility that a defendant has acted unlawfully." *Id.* Facts "'merely consistent with' a defendant's liability" fall short of a plausible entitlement to relief. *Id.* (quoting *Twombly*, 550 U.S. at 557). Further, the Court need not accept as true "legal conclusions" contained in the complaint. *Id.* This review requires context-specific analysis involving the Court's "judicial experience and common sense." *Id.* at 679 (citation omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.*

Where a motion to dismiss is granted, "leave to amend should be granted 'unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency.'" *DeSoto v. Yellow Freight Sys., Inc.*, 957 F.2d 655, 658 (9th Cir. 1992) (quoting *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986)). In other words, where leave to amend would be futile, the Court may deny leave to amend.

## II. Analysis

Plaintiffs assert the following seventeen claims: (1) breach of contract (Macy's); (2) breach of contract (Dummler, LEC, and O'Donnell); (3) breach of contract (Alexander); (4) intentional misrepresentation (Alexander, DAI, Dummler, LEC, Macy's, and O'Donnell); (5) negligent misrepresentation (Alexander, DAI, Dummler,

LEC, Macy's, and O'Donnell); (6) conversion (all Defendants); (7) trademark infringement (all Defendants); (8) false designation of origin (all Defendants); (9) trademark dilution (all Defendants); (10) common law unfair competition (all Defendants); (11) unfair competition in violation of California Business and Professions Code § 17200 (all Defendants); (12) misappropriation of ideas (all Defendants); (13) intentional interference with contractual relations (EPS, Dummler, LEC, Macy's, O'Donnell, and Whirlpool); (14) intentional interference with prospective economic advantage (EPS, Dummler, LEC, Macy's, O'Donnell, and Whirlpool); (15) negligent interference with contractual relations (EPS, Dummler, LEC, Macy's, O'Donnell, and Whirlpool); (16) negligent interference with prospective economic advantage (EPS, Dummler, LEC, Macy's, O'Donnell, and Whirlpool); and (17) declaratory relief (EPS, LEC, Macy's, and Whirlpool).  The Court addresses each in turn.

## A.     Request for Punitive Damages

As a preliminary matter, Alexander Defendants challenge Plaintiffs' "generalized" claims for punitive damages.  (MTD 20, ECF No. 15-1.)  The Court, however, declines to rule on the propriety of Plaintiffs' requests for punitive damages, because a Rule 12(b)(6) motion is the improper vehicle for raising this argument. Rather, Alexander Defendants should have addressed this issue in a Rule 12(f) motion to strike.  *See, e.g.*, *Rodriguez v. JP Morgan Chase & Co.*, 809 F. Supp. 2d 1291, 1300 (S.D. Cal. 2011); *Clark v. Allstate Ins. Co.*, 106 F. Supp. 2d 1016 (S.D. Cal. 2000); *Clement v. Am. Greetings Corp.*, 636 F. Supp. 1326, 1332, 1333–34 (S.D. Cal. 1986).

## B.     Claim 3: Breach of Contract

Alexander Defendants first argue that Promark[1] has not alleged, and cannot, performance of its obligations under the Alexander Contract.  Alexander Defendants

---

[1] Alexander Defendants note that CCT was not a party to the Alexander Contract. (MTD 9 n.3, ECF No. 15-1.)  Because Plaintiffs attached the Alexander Contract as Exhibit 3 to their Complaint, the Court may properly consider it in ruling on this MTD.  *See Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010) (citations omitted).  On its face, the Alexander Contract is only between Alexander Defendants and Promark.  Accordingly, the MTD is **GRANTED WITHOUT PREJUDICE** for this claim as to CCT.

note that Promark claims to have performed all of its obligations under the Macy's Contract rather than the Alexander Contract. (MTD 9–10, ECF No. 15-1 (citing Compl. ¶ 101, ECF No. 1).)  Promark argues that this is a mere typographical error and that it has alleged a breach of the *Macy's Contract*—another apparent typographical error. (Pls.' Resp. in Opp'n 8–9, ECF No. 40.)  No doubt this is a typographical error, but the fact remains that Promark has failed to allege performance under the Alexander Contract anywhere in the Complaint.  Accordingly, as to Promark, Alexander Defendants' MTD is **GRANTED WITHOUT PREJUDICE** as to this claim.

## C.    Claims 4 & 5: Intentional and Negligent Misrepresentation

The elements of a claim for intentional misrepresentation are: "(1) a misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity (or scienter); (3) intent to defraud, i.e., to induce reliance; (4) justifiable reliance; and (5) resulting damage." *Robinson Helicopter Co. v. Dana Corp.*, 102 P.3d 268, 274 (Cal. 2004) (citing *Lazar v. Superior Court*, 12 Cal. 4th 631, 638 (1996)).  To allege a claim for negligent misrepresentation, a plaintiff must plead: "(1) the misrepresentation of a past or existing material fact, (2) without reasonable ground for believing it to be true, (3) with intent to induce another's reliance on the fact misrepresented, (4) justifiable reliance on the misrepresentation, and (5) resulting damage." *Wells Fargo Bank, N.A. v. FSI, Fin. Solutions, Inc.*, 196 Cal. App. 4th 1559, 1573 (2011) (citation and internal quotation marks omitted).

Because a claim for misrepresentation sounds in fraud, the heightened pleading standards of Federal Rule of Civil Procedure 9(b) apply.  For misrepresentation claims, this standard is met when a party specifies the time, place and specific content of the alleged fraudulent representation; the identity of the person engaged in the fraud; and "'the circumstances indicating falseness'" or "'the manner in which [the] representations were false and misleading.'" *Genna v. Digital Link Corp.*, 25 F. Supp. 2d 1032, 1038 (N.D. Cal. 1997) (quoting *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1547–48 (9th Cir. 1994)).  However, "[m]alice, intent, knowledge, and other conditions

of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). But, where multiple defendants are accused of fraud, the claim "must inform each defendant of his alleged participation in the fraud." *Rincon v. Recontrust Co.*, No. 09cv937-IEG-JMA, 2009 WL 2407396, at *3 (S.D. Cal. Aug 4, 2009) (quoting *DiVittorio v. Equidyne Extractive Indus.*, 822 F.2d 1242, 1247 (2d Cir. 1987)). Moreover, merely attributing a misrepresentation to a corporate entity is inadequate; a specific person must be named, or at least identified. *See Kriendler v. Chem. Waste Mgmt., Inc.*, 877 F. Supp. 1140, 1155 (N.D. Ill. 1995).

Alexander Defendants argue that Plaintiffs' misrepresentation claims fail because they do not identify the alleged representation, nor do they allege any of the other elements of these claims with the requisite level of specificity. (MTD 11–12, ECF No. 15-1.) Plaintiffs counter that they adequately allege Alexander Defendants' fraud by stating that Alexander mailed them the signed Alexander Contract on April 14, 2012, because they have impliedly alleged that "Alexander in fact intended to align herself with Defendants Macy's and Whirlpool and to host and promote their show." (Pls.' Resp. in Opp'n 9, ECF No. 40 (emphasis in original).)

The Court agrees with Alexander Defendants that Plaintiffs' allegations are insufficient to state a claim. Plaintiffs generally allege that Defendants, except Whirlpool, "knowingly made false statements" as alleged above. (Compl. ¶¶ 105, 112, 113, ECF No. 1.) Plaintiffs state that these false statements include:

> inducing [Plaintiffs] to proceed with the Tour and taping of the TV Show and allowing them to retain temporary possession of the CCT Assets, while their intention was to take the CCT Assets and use them for their own benefit and to attempt to steal the intellectual property and other rights and interests of [Plaintiffs] for their own profit.

(*Id.* ¶ 105.) However, Plaintiffs fail to specify what Alexander Defendants did, and when, to induce Plaintiffs' actions in this regard. Plaintiffs make no allegations in the Complaint that Alexander was in any way involved in the alleged misappropriation of the CCT Assets, nor do they suggest that Alexander intended to defraud Plaintiffs at the time she signed her contract. (*See, e.g.*, *id.* ¶¶ 47, 75, 77–78.) Accordingly, Plaintiffs

1   fail to allege with specificity Alexander Defendants' misrepresentations, and thus

2   Alexander Defendants' MTD is **GRANTED WITHOUT PREJUDICE** as to these

3   claims.

4   ### D.   *Claim 6: Conversion*

5          Alexander Defendants next argue that Plaintiffs' conversion claim fails because

6   Plaintiffs fail to allege Alexander Defendants' possession of the CCT Assets at any

7   time. (MTD 12, ECF No. 15-1.) Plaintiffs argue that they properly allege a conversion

8   claim because "[a]n action for conversion lies not only in the taking of another's

9   property, but also in the use of that property," and Alexander Defendants converted

10  Plaintiffs' property when Alexander used the CCT Assets for her own benefit, including

11  promoting GACT and posting GACT footage on Alexander's website. (Pls.' Resp. in

12  Opp'n 10, ECF No. 40.)

13         The Court agrees with Plaintiffs that they have pleaded a claim for conversion.

14  The elements of a claim for conversion consist of (1) ownership or a right to possession,

15  (2) wrongful disposition of the property, and (3) damages. *G. S. Rasmussen & Assocs.,*

16  *Inc. v. Kalitta Flying Serv., Inc.*, 958 F.2d 896, 906 (9th Cir. 1992). Moreover, § 229

17  of the Restatement (Second) of Torts provides:

18         One who receives possession of a chattel from another with the intent to
           acquire for himself or for a third person a proprietary interest in the
19         chattel which the other has not the power to transfer is subject to liability
           for conversion to a third person then entitled to the immediate possession
20         of the chattel.

21  California Courts have cited approvingly to § 229. *See, e.g.*, *Moore v. Regents of Univ.*

22  *of Cal.*, 51 Cal. 3d 120, 157 n.4 (1990); *Strutt v. Ontario Sav. & Loan Ass'n*, 28 Cal.

23  App. 3d 866, 874–75 (1972).

24         Plaintiffs repeatedly assert their ownership of the GACT copyright, trademark,

25  and content. (Compl. ¶¶ 14–16, 28, 48, 118, ECF No. 1.) Plaintiffs purportedly

26  "consented to LEC holding the CCT Assets temporarily until it could be determined

27  where they should be sent." (*Id.* ¶ 75.) Plaintiffs have since requested the return of the

28  CCT Assets. (*Id.* ¶ 77.) Yet, the assets have not been returned. (*Id.*) Rather, Plaintiffs

allege that, as of December 2012, Alexander had been, for several months, promoting "her 'new show'—which is the 'Great American Chefs Tour'—"by posting photographs and videos, "all shot during the Tour," on her website and Facebook page. (*Id.* ¶ 81.) Thus, Plaintiffs had a right to immediate possession of the CCT Assets, including the Tour footage. LEC had possession of the CCT Assets, but not the power to transfer them. And Alexander appears to have acquired the Tour footage from LEC with the intent to make it her own, as she deemed the footage to be from "her" show. That Alexander may not have ever possessed the physical tapes is of no consequence, as she did gain possession of the intellectual property contained therein.[2]

Alexander Defendants also contend, however, that the claim must be dismissed because Plaintiffs improperly seek compensatory damages rather than the damages for conversion mandated by California Civil Code § 3336. (MTD 12–13, ECF No. 15-1 (citing Compl. ¶¶ 122–23, ECF No. 1).) However, Plaintiffs allege that they "ha[ve] been damaged" from their loss of the CCT Assets and their inability to distribute GACT themselves, which is all that is required on a motion to dismiss. (Compl. ¶¶ 102, 122, ECF No. 1.) *See Summit Tech., Inc. v. High-Line Med. Instruments, Co.*, 933 F. Supp. 918, 927–28 (C.D. Cal. July 16, 1996) (citation, alteration, and internal quotation marks omitted) ("[A] Rule 12(b)(6) motion will not be granted merely because a plaintiff requests a remedy to which he or she is not entitled.") Accordingly, Plaintiffs have stated a prima facie claim for conversion, and Alexander Defendants' MTD must be **DENIED** as to this claim.

## E.     Claims 7 & 8: Trademark Infringement and False Designation of Origin

To state a claim for federal trademark infringement under the Lanham Act, a plaintiff must show: "'(1) that it has a protectible ownership interest in the mark; and

---

[2] "In short, California does not follow the *Restatement*'s strict requirement that some document must actually represent the owner's intangible property right. On the contrary, courts routinely apply the tort [of conversion] to intangibles without inquiring whether they are merged in a document." *Kremen v. Cohen*, 337 F.3d 1024, 1033 (9th Cir. 2002) (explaining that California jurisprudence "recognizes conversion of music recordings, radio shows, customer lists, regulatory filings, confidential information and even domain names").

(2) that the defendant's use of the mark is likely to cause consumer confusion.'" *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1144 (9th Cir. 2011) (citation omitted). A claim for false designation of origin is subject to "[t]he same standard," except a claim for false designation of origin does not require that the mark be registered. *See Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.*, 174 F.3d 1036, 1046 n.6 (9th Cir. 1999) (citing 15 U.S.C. §§ 1114(1) (trademark infringement), 1125(a)(1) (false designation of origin)). Accordingly, the Court analyzes these claims jointly.

As to the first element, Alexander Defendants argue that judicially noticeable records establish that only CCT owns the GACT trademark. (MTD 13 n.4, ECF No. 15-1 (citing RJN Exs. 8–11, ECF No. 15-6).) Alexander Defendants, however, are mistaken. The documents at issue are from June 2011 through May 2012. Thus, it is possible that CCT assigned the GACT mark to Promark sometime after May 22, 2012 but prior to or during the acts comprising Plaintiffs' allegations. Thus, the Court declines at this time to dismiss the trademark claims against Promark on this basis. Plaintiffs allege ownership of the mark as to both Promark and CCT, and thus Plaintiffs have sufficiently alleged the first element of their trademark infringement claim. (*See* Compl. ¶¶ 16, 125, ECF No. 1.)

As to the second element, Alexander Defendants argue that Plaintiffs fail to allege "that Alexander is using a trademark, let alone using CCT's trademark or a colorable imitation of CCT's mark on goods in commerce without CCT's consent or that such use is likely to cause confusion, mistake or deceive the public." (MTD 13–14, 14–15, ECF No. 15-1.) The Court disagrees. When evaluating likelihood of confusion on a motion to dismiss, "[i]f the court determines as a matter of law from the pleadings that the goods are unrelated and confusion is unlikely, the complaint should be dismissed." *Murray v. Cable Nat'l Broad. Co.*, 86 F.3d 858, 860 (9th Cir. 1996) (citing *Toho Co. Ltd. v. Sears, Roebuck & Co.*, 645 F.2d 788, 790–91 (9th Cir. 1981)). But, while likelihood of confusion *can* be decided as a matter of law, "[w]hether confusion

is likely is a factual determination woven into the law" that courts "routinely treat . . . as [an issue] of fact" best left for determination by a jury. *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1356, 1356 n.5 (9th Cir. 1985).

It does not appear as a matter of law that consumer confusion is unlikely. Plaintiffs allege that "Defendants have used and are using [Plaintiffs'] registered mark." (Compl. ¶ 126, ECF No. 1.) Plaintiffs claim that Defendants are using the mark in commerce, "in connection with the distribution[] and/or advertising of a television show." (*Id.*) More specifically, Plaintiffs allege that "Alexander has been promoting her 'new show'—which is the 'Great American Chefs Tour'—on her web site and on her Facebook page," and that these promotions have included the infringing name. (*Id.* ¶ 81; Pls.' Resp. in Opp'n 11, ECF No. 40.) Plaintiffs claim that Alexander Defendants' use of the mark is without Plaintiffs' consent. (Compl. ¶ 126, ECF No. 1.) And, Plaintiffs allege that the use of the mark is likely to confuse consumers. (*Id.*) This seems particularly true given that the goods are so similar—indeed, Plaintiffs claim that Defendants are really marketing Plaintiffs' television show as Defendants' own. (*Id.* ¶¶ 79–87.) Accordingly, the Court finds that Plaintiffs have satisfactorily alleged federal trademark infringement and false designation of origin claims and **DENIES** Alexander Defendant's MTD as to these claims.

## F.    *Claim 9: Trademark Dilution*

To plead a claim for federal trademark dilution, a plaintiff must show that it owns a famous and distinctive trademark, that the defendant began using the mark in commerce after the mark became famous, and that the defendant's use of the mark is likely to cause dilution by blurring or tarnishment. *Visa Int'l Serv. Ass'n v. JSL Corp.*, 610 F.3d 1088, 1089–90 (9th Cir. 2010) (citing *Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 634 (9th Cir. 2007)); *see also* 15 U.S.C. § 1125(c).

The parties disagree as to whether Plaintiffs adequately allege a famous mark. "A mark is famous if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner."

15 U.S.C. § 1125(c)(2)(A).  In determining whether a mark is famous, a court may consider "all relevant factors," including: (1) "[t]he duration, extent, and geographic reach of advertising and publicity of the mark"; (2) "[t]he amount, volume, and geographic extent of sales of goods or services offered under the mark"; (3) "[t]he extent of actual recognition of the mark"; and (4) whether the mark is registered.  *Id.* § 1125(c)(2)(A)(i)–(iv).  Alexander Defendants urge that Plaintiffs do not allege that a large percentage of the general consuming public recognizes the GACT mark, only that it was presented to several television stations in 2011 and at a public television industry event.  (MTD 15–16, ECF No. 15-1.)  Plaintiffs counter that Alexander Defendants' arguments go to the merits of the case rather than the sufficiency of the Complaint.  (Pls.' Resp. in Opp'n 11–12, ECF No. 40.)  The Court, however, agrees with Alexander Defendants.

The Court notes that the GACT mark is federally registered, and thus the fourth factor favors a finding of fame.  However, Plaintiffs make no allegations about any advertising and publicity efforts; Plaintiffs apparently made no sales of any GACT content; and Plaintiffs fail to allege any facts concerning *wide-reaching* actual recognition of their mark.  Plaintiffs allege that their mark was well-received by television stations and had a "substantial presence" at the APT Fall Marketplace, which appears to have been attended primarily by persons in the entertainment industry.  (Compl. ¶ 138, ECF No. 1.)  Plaintiffs also argue that the show was filmed over the course of ten live events in several major cities.  (*Id.*)  However, these allegations fall short of "wide recognition," and at most suggest that the mark might be famous in the insufficient "niche" market of the entertainment industry.  *See Planet Coffee Roasters, Inc. v. Dam*, No. SACV 09-00571-MLG, 2009 WL 2486457, at *3 (C.D. Cal. Aug. 12, 2009) (citations omitted).  Thus, even applying the relatively lax standard governing Rule 12(b)(6) motions, the Court finds that Plaintiffs' conclusory allegations of fame fail to state a "facial[ly] plausib[le]" claim for trademark dilution.  *See Iqbal*, 556 U.S. at 678.  Accordingly, the Court **GRANTS WITHOUT PREJUDICE** Alexander

Defendants' MTD as to this claim.

## G.   Claim 10: Common Law Unfair Competition

"'The common law tort of unfair competition is generally thought to be synonymous with the act of "passing off" one's goods as those of another . . . [, or] acts analogous to "passing off," such as the sale of confusingly similar products, by which a person exploits a competitor's reputation in the market.'" *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1147 (9th Cir. 1997), *not followed on other grounds by McKendall v. Crown Control Corp.*, 122 F.3d 803 (1997) (alteration in original) (quoting *Bank of the W. v. Superior Court*, 2 Cal 4th 1254, 1263 (1992)); *see also Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1153 (9th Cir. 2008). "The tort developed as an equitable remedy against the wrongful exploitation of trade names and common law trademarks that were not otherwise entitled to legal protection." *Bank of the W.*, 2 Cal 4th at 1263 (citation omitted). Thus, "[t]he common law tort of unfair competition . . . require[s] a showing of competitive injury." *Id.* at 1264 (citations omitted). "The decisive test of common law unfair competition is whether the public is likely to be deceived about the source of goods or services by the defendant's conduct. *Hokto Kinoko Co. v. Concord Farms, Inc.*, 810 F. Supp. 2d 1013, 1032 (C.D. Cal. 2011) (citations omitted).

Alexander Defendants argue that Plaintiffs' claim of common law unfair competition must be dismissed because Plaintiffs hold a valid, registered trademark. (*See* MTD 17, ECF No. 15-1; Reply 8, ECF No. 42-1.) However, courts have routinely entertained claims for both trademark infringement and common law unfair competition, implying that the two causes of action are not mutually exclusive, particularly at the pleading stage. *See, e.g.*, *Hokto Kinoko*, 810 F. Supp. 2d 1013; *Wecosign, Inc. V. IFG Holdings, Inc.*, 845 F. Supp. 2d 1072, 1079 (C.D. Cal. 2012) ("[T]he Ninth Circuit 'has consistently held that state common law claims of unfair competition and actions pursuant to California Business and Professions Code § 17200 are "substantially congruent" to claims under the Lanham Act.' . . . Therefore, the

1   Court jointly analyzes Plaintiff's trademark infringement, false designation of origin,

2   state statutory unfair competition, and state common law unfair competition claims.");

3   *Moroccanoil, Inc. v. Allstate Beauty Prods., Inc.*, 847 F. Supp. 2d 1197 (C.D. Cal.

4   2012); *Vallavista Corp. v. Amazon.com, Inc.*, 657 F. Supp. 2d 1132 (N.D. Cal. 2008);

5   *Microsoft Corp. v. Nop*, 549 F. Supp. 2d 1233 (E.D. Cal. 2007); *Area 55, Inc. v.*

6   *Pandamerican LLC*, No. 10-CV-269-H (NLS), 2010 WL 3564715 (S.D. Cal. Sept. 10,

7   2010);  *Mallard Creek Indus., Inc. v. Morgan*, 56 Cal. App. 4th 426 (1997).  Thus, the

8   Court does not believe that Plaintiffs' common law unfair competition claim is

9   precluded as a matter of law.  Moreover, because the Court has already determined that

10  Plaintiffs have plausibly alleged possible consumer confusion (*see supra* p. 17), the

11  Court **DENIES** Alexander Defendants' MTD as to this claim.

12  ## H.    Claim 11: Violation of California Business and Professions Code § 17200

13          California's Unfair Competition Law ("UCL") prohibits "any unlawful, unfair

14  or fraudulent business act or practice and unfair, deceptive, untrue or misleading

15  advertising."  Cal. Bus. & Prof. Code § 17200.

16          Alexander Defendants argue that the "general statement that some general acts

17  in the 39 pages of facts may constitute unfair competition" is insufficient.  (MTD 18,

18  ECF No. 15-1.)  Accordingly, because

19          Plaintiffs' Complaint does not: (1) allege in what unfair business
20          practices Alexander has engaged; (2) allege facts that Alexander was
            involved in monopolistic or anticompetitive practices; (3) identify a
21          particular section of the statutory scheme that was violated; (4) describe
            facts supporting a violation; [or] (5) allege facts establishing a causal
22          link between defendants' business practices and the alleged harm,

23  Plaintiffs' UCL claim must be dismissed.  (*Id.*)  Plaintiffs, on the other hand, claim to

24  have satisfactorily alleged unfair, unlawful, *and* fraudulent business practices in their

25  Complaint.  (Pls.' Resp. in Opp'n 13, ECF No. 40.)

26          Plaintiffs argue that, because Alexander Defendants' actions constitute business

27  practices, and because those acts "form the basis of several other claims for relief" in

28  the Complaint, they have satisfactorily alleged unlawful business activities.  (*Id.* at 14.)

    The Court agrees.  "An unlawful business activity includes anything that can properly

be called a business practice and that at the same time is forbidden by law." *Blank v. Kirwan*, 703 P.2d 58, 69 (Cal. 1985) (internal quotation marks omitted) (quoting *People v. McKale*, 25 Cal. 3d 626, 631–32 (1979)). The act of promoting a television show as one's own is certainly a business practice, and because the Court has found that Plaintiffs have plausibly alleged several violations of law, those violations can serve as predicate unlawful business activities under the UCL. *See Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 973 P.2d 527, 539–40 (Cal. 1999) (internal quotation marks and citations omitted) ("[S]ection 17200 'borrows' violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable.").

Plaintiffs claim to have pleaded unfair business practices by "alleg[ing] that [Plaintiffs] invented, developed, and shot a television show, and that Defendants took that television show (including both the concept and the raw footage), made a very slight change to its name and then began airing Plaintiff's [*sic*] footage as a competing television show." (Pls.' Resp. in Opp'n 13, ECF No. 40.) The Court, however, disagrees. Under the UCL, "the word 'unfair' . . . means conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." *Cel-Tech Commc'ns*, 973 P.2d at 544. Plaintiffs' allegations, if true, certainly allege unfair acts in a more generalized moral sense. *See F.T.C. v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244 n.5 (1972) (explaining that "a practice that is neither in violation of the antitrust laws nor deceptive [can] nonetheless [be] unfair" if it is "immoral, unethical, oppressive, or unscrupulous"). However, Plaintiffs' allegations fail to allege acts that more narrowly violate the spirit of the antitrust laws, such as horizontal price fixing, exclusive dealing, or monopolization. *See* Holmes & Mangiaracina, Antitrust Law Handbook § 7:2. Accordingly, Plaintiffs do not allege unfair practices within the meaning of the UCL.

Finally, Plaintiffs argue that Alexander Defendants have engaged in fraudulent business practices by "passing off Plaintiffs' raw footage as their own show" and

promoting the show under a confusingly similar name. (Pls.' Resp. in Opp'n 14, ECF No. 40.) The Court agrees. "The fraud prong of the UCL is unlike common law fraud or deception. A violation can be shown even if no one was actually deceived[ or] relied upon the fraudulent practice. . . . Instead, it is only necessary to show that members of the public are likely to be deceived." *Schnall v. Hertz Corp.*, 78 Cal. App. 4th 1144, 1167 (2000) (internal quotation marks, citations, and alteration omitted). Accepting Plaintiffs' allegations as true, Defendants are actively trying to deceive the public into believing that Plaintiffs' show is instead their own. And, the Court has found that Plaintiffs have plausibly alleged possible consumer confusion. (*See supra* p. 17.) Accordingly, Plaintiffs have adequately pleaded that Alexander Defendants' engaged in unlawful and fraudulent acts in violation of the UCL, and thus the Court **DENIES** Alexander Defendants' MTD as to this claim.

## I.   *Claim 12: Misappropriation of Ideas*

Finally, the Court finds that Plaintiffs' twelfth claim is preempted by the Copyright Act of 1976 ("the Act"). "Preemption occurs when (1) the work at issue comes within the subject matter of copyright and (2) the rights granted under state law are 'equivalent to any of the exclusive rights within the general scope of copyright' set forth in the Act." *Selby v. New Line Cinema Corp.*, 96 F. Supp. 2d 1053, 1057 (C.D. Cal. 2000) (quoting *Del Madera Props. v. Rhodes & Gardner, Inc.*, 820 F.2d 973, 976 (9th Cir. 1987)).

First, because Plaintiffs' ideas have been affixed in a tangible, copyrighted work—the GACT footage—Plaintiffs' twelfth claim falls within the scope of federal copyright law. *See id.* at 1057–59. Second, the rights afforded by the Act are equivalent because "Plaintiff[s'] breach of implied contract claim falls squarely into the category of contract claims that allege no additional rights other than promising not to benefit from the plaintiff's work." *Id.* at 1062 (internal quotation marks, alteration, and citations omitted). In other words, because Plaintiffs "allege an implied-in-fact contract not to use [their] ideas and concepts . . . without compensating [them]," they do not

allege a contract that "protects or creates any rights not equivalent to the Act's exclusive prohibitions of unauthorized reproduction, performance, distribution, or display." *Id.* at 1062, 1060–61 (citation omitted).   Accordingly, Plaintiffs' twelfth claim is preempted, and therefore this Court **GRANTS WITH PREJUDICE** Alexander Defendants' MTD as to this claim.

## CONCLUSION

In light of the foregoing, the Court **GRANTS** Alexander Defendants' Request for Judicial Notice, **GRANTS** Plaintiffs' Request for Judicial Notice, and **GRANTS IN PART AND DENIES IN PART** Alexander Defendants' Motion to Dismiss.

The Court **GRANTS** Alexander Defendants' Motion to Dismiss **WITHOUT PREJUDICE** as to claims 3, 4, 5, and 9.  The Court **GRANTS** Alexander Defendants' Motion to Dismiss **WITH PREJUDICE** as to claim 12, as amendment of this claim would be futile.  *See DeSoto*, 957 F.2d at 658.  The Court **DENIES** Alexander Defendants' Motion to Dismiss as to claims 6, 7, 8, 10, and 11.

If Plaintiffs wish, they **SHALL FILE** an amended complaint within <u>fourteen (14) days</u> of the date on which this Order is electronically docketed.  *Failure to file an amended complaint by this date may result in dismissal of Plaintiffs' claims against Alexander Defendants with prejudice.*

**IT IS SO ORDERED**.

DATED:  April 25, 2014

Honorable Janis L. Sammartino
United States District Judge

13cv2714